UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| YESSENNIA RODAS MONTALVO and JOSE MONTALVO,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF NEWARK, VINCENT GAGLIANO, SAMUEL DeMAIO, LILLIAN MEJIAS, ANTHONY F. AMBROSE, III, IRVING BRADLEY, RONALD KINDER, KURT EBLER, JOHN AND JANE DOES 1-10<br><br>Defendants. | Civil Action No. 06-cv-01505 (JAG)<br><br>AMENDED COMPLAINT AND JURY DEMAND |

Plaintiffs, YESSENIA RODAS MONTALVO and JOSE MONTALVO, for their Amended Complaint against Defendants, allege as follows:

**General Allegations**

1.      Plaintiffs are husband and wife, but hereinafter described as "Rodas" and "Montalvo" for purpose of this Complaint, as they were so known by the Employer. Both parties are residents of the State of New Jersey, residing at 865 Broadway, Newark, New Jersey.

2.      Defendant, City of Newark, provides a Police Department (hereinafter "Employer" or "Police Department"), and is located at 31 Green Street, Newark, New Jersey.

3.      Under N.J.S.A. 14-118, a municipality, like the City of Newark, may create a police force and provide for its maintenance, regulation and control. The Ordinance has provided for a line of authority related to police functions, for the adoption of rules

and regulations for the governing of the force, and for the discipline of its members. The Municipal Council must and should monitor its operations.

4.     Through recent times, the Employer deliberately chose to ignore its rules and regulations as would impact former Police Director, Anthony Ambrose, the Chief of Police, Irving Bradley, Deputy Chief Vincent Gagliano, Deputy Chief Samuel DeMaio, Detective Lillian Mejias, Lt. Ronald Kinder and Deputy Chief Kurt Ebler, extraordinary liberties to harm the Plaintiffs or have other Employer's agents so harm Plaintiffs, and this would include the Chain of Command, Internal Affairs Division and other City Agencies.

5.     Defendants, John and Jane Does 1-10, sitting on the Municipal Council were, or are still, Administrators, agents, subsidiaries or other policymaking and enforcement individuals.   They caused Plaintiffs harm and would not protect them through their very last days on the police force when they were wrongfully terminated.

6.     Defendant, City of Newark, through its agents, including John and Jane Does 1-10, knew, or were possessed of knowledge, of the material facts intended to harm these Plaintiffs and did nothing to oversee or monitor their Police Department operations, including the Chain of Command, Internal Affairs Division, Medical Services and the CERT Program developed for Homeland Security.

7.     The Employer is liable *respondeat superior* for all allegations of the within Complaint.

2

## FIRST COUNT
## Hostile Work Environment
## (Multiple Forms)

1.      Plaintiffs repeat and reallege the General Allegations, as if set forth at length herein.

2.      Originally, Plaintiffs were intentional victims of false statements and vicious rumors started and spread by former Captain Vincent Gagliano, which hurt each of them.

3.      Said Gagliano pretended he caught Plaintiffs having sexual relations within the Communications Building and made a false report.  Plaintiffs absolutely denied the allegation.

4.      Plaintiffs suffered a very long and harassing Internal Affairs investigation, which was supposed to clear each of them of any perception of wrongdoing or false charges, if results occurred in their favor.

5.      Although the investigation produced results in Plaintiffs' favor, a severe and retaliatory hostile work environment was established.

6.      The intentional spread of false rumors produced an adverse impact upon their personal lives, marriages and careers.

7.      There was no effort for confidentiality or protection of Plaintiffs pursuant to standard rules and protocol.

8.      While there was absolutely no truth to the horrendous gossip that Plaintiffs had sex on a comstat table, Plaintiff Rodas' marriage completely fell apart due to jealousy and the strain of constant remarks being made by fellow police officers.

9.     In the situation of Plaintiff Montalvo, there was a problem in that Montalvo's spouse, Detective Lillian Mejias, was already sexually involved with the Deputy Chief, Samuel DeMaio.  Montalvo announced their marriage was over and he wanted a divorce, but, now, there was reprisal activity permitted within the scope of officers' duties targeted to each Plaintiff.

10.     The Internal Affairs prolonged investigation was irregular and the methods by which it was conducted hurt Yessenia Rodas and Jose Montalvo, separately and jointly, as follows.

### As to Yessenia Rodas

11.     Officer Rodas was immediately demoted from a Detective status to dispatcher at the Communications Division on the accepted premise she would be found guilty of the charges brought against her.  Furthermore, Plaintiff Rodas was compelled to work at her precinct cellblock.

12.     For almost two years, Rodas became a captive audience to male officers alternating between sexually hostile remarks directed to her, and exposing Plaintiff to embarrassing pornography, whether it be the details of their conversations or video/television options which should not have been available in the cellblock.

13.     As Plaintiff Rodas complained, she was flatly told that: "It should not bother her; she had to live down her reputation as a 'whore' or slut within the police force.  Nothing should offend her."

14.     The blameworthy officers should have been charged with engaging in discriminatory conduct constituting sexual harassment in violation of N.J.A.C. 4A:2-2.3(a).  According to the police manuals as being taught: "Sexual harassment is a form

4

of sex discrimination which violates Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e-1 to 2000e-17 and the New Jersey LAD, N.J.S.A. 10:5-1 to 10:5-42," but nothing was done for Rodas.

15. The constant statement directed to Plaintiff was that: "Hispanic female officers, like her, were the whores of the white officers." Plaintiff was made the constant "butt" of cruel jokes, as if she made a big mistake by choosing an Hispanic lover when she could have been protected by white officers, instead.

16. All this conduct would not have occurred but for Rodas' perceived ethnic/racial and gender vulnerability. The conduct was severe and pervasive enough to make a reasonable Hispanic woman believe the condition of her employment had altered. The working environment was hostile and extremely abusive, including the false statements of Gagliano and other agents of the Employer who kept spreading false statements.

17. No matter how offended Plaintiff appeared or tried to defend her reputation, she was mocked and ridiculed. Further, Rodas was shunned and ostracized by former supporters and colleagues on the notion she must be guilty since the Internal Affairs investigation occurred for so long and erroneous notions that they must be proving charges against her.

18. In the end, there was no corrective remedy when the Plaintiffs were cleared of wrongdoing. The damage was already done, as both an illegal and discriminatory condition of Plaintiff's employment and there was no discipline or charges to anyone but Rodas and Montalvo.

5

19.    Plaintiff Rodas kept applying for transfer out of the cellblock, but she was ignored until Deputy Director, Rocco Malanga, specifically requested that Rodas begin working for him in the Homeland Security assignment.    While the pornographic materials disappeared from Plaintiff's workplace, a hostile work environment was permitted and condoned by Department personnel.

20.    In Plaintiff's new assignment, Rodas was routinely sent on Wednesday evenings to work overtime for the CERT Program and she dutifully complied to her instructions.

21.    The aforesaid Detective Lillian Mejias aggressively seized the opportunity to become abusive to Plaintiff in their meetings in the hallways and Plaintiff tried to ignore or avoid Mejias.

22.    On March 30, 2005, Detective Mejias intentionally caused an assault and battery upon Plaintiff and, when Rodas complained, she was threatened with retaliation by reason that Lillian Mejias was openly protected by the Commanding Officers in charge, including Samuel DeMaio, Anthony F. Ambrose, III and other high ranked Officers, who "acted loyal" to Mejias because of her ongoing sexual relationship with Samuel DeMaio, who was then promoted to Deputy Chief.

23.    This was not the first offensive conduct by Mejias, and Plaintiff complained about her, but Plaintiff's allegations were rejected, although these malevolent and malicious acts occurred in the scope of Newark officers' duties and were against Department rules and regulations.

24.    The Plaintiffs' personal relationship began to develop from the discriminatory hostile work environment faced by each of them. The adverse result was harassment from officers at their own precinct acting on behalf of Mejias or DeMaio.

25.    In the past, the accused parties had barely spoke to each other and they were definitely not social in any way. In point of fact, Rodas had much more of an acquaintance with Lillian Mejias, although that changed when Rodas obtained the false accusation and Mejias turned against her.

26.    Incidents as minor as delivery of mail to Plaintiffs' home (when Mejias had never resided on the premises) would become harassing events requiring guidance from their FOP representative.

27.    Moreover, Plaintiffs experienced retaliatory activity for reporting each incident until they realized that it was "foreseeable" harm to take any "protective" action within the precinct.

28.    For instance, Plaintiff Rodas' vehicle was spray painted and she filed a report CC#02106019, but her vehicle became spray painted on two more occasions in direct reprisal.

29.    Also, there were burglary incidents where Plaintiff filed for help and intervention, just like any other private citizen. Nothing was done for her, although criminal proceedings and proper Internal Affairs investigations should have followed.

30.    Plaintiff Rodas became so frustrated that Sergeant Jose Alvarez of Internal Affairs was so complacent and nonchalant that she gave a video statement regarding the lack of discipline to Lillian Mejias and pertaining to other officers who should have acted to protect her.

7

31.    Rodas put herself on record for the severely hostile work environment and pursued charges of conduct unbecoming public employees N.J.A.C. 4A:2.3(A)6 and for police officers' discriminatory conduct constituting a sexual harassment N.J.A.C. 4A:2-2.3(a)g, but no charges were brought or properly investigated on her behalf.

32.    Desperate for a solution, and knowing nothing would be done for Rodas or Jose Montalvo, these Plaintiffs went beyond the "blue code of silence" and disclosed the extramarital personal relationship of Detective Lillian Mejias and the Deputy Chief Samuel DeMaio, who was married.   Certainly, the Plaintiffs were concerned for retaliation, but they knew they had to take action.

33.    Therefore, Plaintiff Rodas identified for Sergeant Alvarez a sufficient list of police officers who had common knowledge of the sexual (extramarital) affair of Mejias and DeMaio, and its direct impact upon her within the scope of her work, or when she was being victimized at home.   There was still no impartial investigation by IAD or any other Newark agency.

34.    Plaintiff Rodas pursued a 1001 Administrative Submission to Deputy Director Rocco M. Malanga, Office of Homeland Security, on April 5, 2005 when nothing was being done for her.

35.    It followed that Lillian Mejias remained at her Command as did Samuel DeMaio.  Moreover, the Plaintiffs' complaints went nowhere.

36.    For all times mentioned, Internal Affairs agents intentionally contributed to Plaintiffs' problems and there was purposeful retaliatory activity.   Their role in investigating Plaintiffs' ongoing complaints was only a cover-up of their own intentional discriminatory malfeasance, animus and hatred.

8

37.    It became readily apparent the City of Newark, its Police Department and other Agencies, including Defendants John and Jane Does 1-10, condoned and accepted the sexual, gender or racial harassment and severe and extreme hostile work environment tactics being imposed on these Plaintiffs.

38.    Between 2002 and 2004, and for all other times mentioned, Internal Affairs ignored Plaintiffs' written complaints, or did not conduct proper investigations despite their own Memorandum, Orders and Rules. Nothing was done for any corrective action or protective relief to the Plaintiffs, ever.

39.    There was not even recognition that Plaintiffs should have been protected Employees. Thus, Plaintiffs recognized they had to hire their own private counsel because they were being purposely ignored, and when they did file a lawsuit, the final adverse action immediately before Defendants Ambrose and Bradley retired, was to wrongfully terminate the Plaintiffs, as their last revenge.

40.    During 2005 and 2006, Plaintiffs suffered constant retaliation and Internal Affairs only exaggerated their problems and issued more false charges. Since Internal Affairs reported to Director Anthony Ambrose, their situation was calculated wrongdoing.

41.    Plaintiff Rodas was officially charged with neglect of duty for not reporting an injury stemming back to the incident with Lillian Mejias and a police trial was held over Plaintiff's head during the entire time that she was out on sick leave due to complications with her pregnancy.

42.    Meanwhile, Plaintiff Jose Montalvo was officially charged with "False Statement" and "Being Out of Uniform." The first charge against him arose out of the

9

Administrative Report that Montalvo submitted after no one in Internal Affairs would investigate the incidents between Mejias and Rodas. (Montalvo knew something had to be done to protect Rodas from further assault, battery or retaliatory harassment.)

43.   The second charge against Montalvo should not have occurred since Montalvo had a problem with coffee spilling on his uniform and he had obtained official permission to be out of uniform.

44.   From the time of March 20, 2005, Plaintiff Rodas was actually barred from entering the fourth floor at 31 Green Street, Newark, in lieu of punishing the actual wrongdoer, Mejias, or the other police officers involved in harassing each Plaintiff.

45.   For her earlier complaints, Plaintiff Rodas was singled out to participate in an anger management class. Further, this Plaintiff was threatened with a five (5) day suspension if she did not take the class.

46.   After March 30, 2005, Plaintiff Rodas was fearful that Mejias would intentionally harm her person, as every situation became a confrontation and more threatening, and Mejias was being rewarded with special positions and promotion.

47.   Moreover, Rodas felt jeopardized in her job by reason of the retaliatory efforts of higher ranked officers calculated to harm her as continuing threats of punishment, including writing her up for more false charges.

48.   Nevertheless, Plaintiff Rodas remained dedicated to the CERT Program and performed all work required of her until she had to pursue an extended sick leave due to miscarriage and what became high risk pregnancy with triplets and, then, twins when one fetus died.

49. Plaintiff's approved leave of absence began on or about May 26, 2005 and, thereafter, she received constant harassing telephonic communications from the Command throughout her day.

50. Plaintiff Rodas was admonished she could not appear in Court for charges she brought against Lillian Mejias, since she was out on sick leave, but no one from the Command would contact the Court to confirm their restraints on her rights or freedom to bring charges in the Municipal Court.

51. Fearful of what would occur, on June 22, 2005, Rodas requested that Montalvo appear in Court and explain the predicament of restraint placed on her. The Presiding Judge became disgusted with the Employer and dismissed the case, although a medical note was produced, as proof.

52. By October 19, 2005, Lieutenant Kinder of Medical Services began to make inquiries of Rodas to determine she was at home, and he demanded to see the Plaintiff's medical note, which was already processed for months through the proper channels and her reporting structure.

53. Plaintiff Rodas confirmed exactly what Lieutenant Kinder already knew, that she was out on a restriction of bed rest until after her babies were born. It took nine months to conceive and she was cast as a high risk pregnancy from the outset.

54. Lieutenant Kinder and Sergeant Amos from Medical Services alternated contacting Plaintiff at home, although Precinct Officers were simultaneously harassing Plaintiff at home.

55. Sergeant Palmar Amos informed Plaintiff that Lieutenant Kinder would not be satisfied by her physician's notes. This Officer wanted her evaluated by the

11

Surgeon's office.  Plaintiff tried to explain that she was now subject to complete bed rest, but that did not appease the Officer in charge.

56.     Events transpired at October 25, 2005, where Plaintiff obtained more bad news about Jose Montalvo and his police trials.  He received punishment at 2005 for charges at 2001, leaving him suspended for 20 days, total, and loss of an entire month's wages just before their babies were born.

57.     As a proximate cause, Rodas became extremely upset and she was caused to contact her physician for an emergency appointment.  This Plaintiff ended up at Saint Barnabas Hospital and, due to extremely high blood pressure and other persisting symptoms, it was decided it was unsafe for her at home.

58.     Plaintiff's physicians knew that Plaintiff obtained constant harassing communications from her Employer and feared that the negative forces from work were causing her maternity risk consequences, particularly after one baby died in the womb after an incident.

59.     Plaintiff's last two babies were born at 3 pounds, and premature at 32 weeks, such that they could not be released from the hospital by November 1, 2005 with their mother.  Each baby was released on a separate occasion, November 24, 2005 and December 1, 2005, respectively.

60.     Critically, Plaintiff had to have an emergency c-section when one of the twin's hearts had stopped on October 27, 2005.

61.     For these times, Plaintiff reported into the Employer the changes in her status, whether it be hospitalization, the trauma of losing a baby, risking the other two

babies, or becoming anxious, depressed or compromised, herself. Plaintiff was always compliant to her duties of "reporting," although she was so emotionally distraught.

62. Her physician administered prescriptive medications with psychotropics to mentally enable her to cope with her losses by January 9, 2006, when the same persisting symptoms of anxiety and depression were still noticeably present.

63. At January 26, 2006, Lieutenant Kinder, without any regard for Plaintiff's fragile medical status, verbally notified Plaintiff that she was to be charged for failing to indicate the birth of her twins. Kinder also informed Plaintiff she would be subject to a fitness for duty evaluation for the immediate future.

64. Once again, Plaintiff tried to defend her actions and she explained that the Command already received new medical notes, which were duly submitted, but Kinder's response was only to follow through with greater reprisal action. Plaintiff was told of her "evaluation requirement" pre-scheduled on February 3, 2006 to appear before the City of Newark Police Surgeon.

65. Plaintiff reminded Lieutenant Kinder that her physician's note put her out only until February 28, 2006. Plaintiff followed up with her own physician for scheduled appointments and continued the prescribed medications. Her new note put her back to work as of February 28, 2006.

66. As further reprisal, Plaintiff found on her return date that she was pre-scheduled to start her vacation time for 2005. Therefore, Rodas was ordered to "vacation" from February 28, 2006 to March 20, 2006.

67. During this time, Plaintiff learned, at an FOP meeting, of an ongoing, well publicized website known as "Newark Speaks." Officers and the public were utilizing

rights of free speech to air matters of public concern and to articulate abuse of authority concerns.

68. Plaintiff questioned whether there was protected speech for public employees and anonymity and spokesmen affirmed that employees had definite rights to speak out and to do it, anonymously, and she pondered whether her own situation of that of her spouse, Jose Montalvo, required a public forum to obtain any justice since their rights were being violated in the workplace.

69. Before Plaintiff was wrongfully terminated, as set forth in other Counts of this Complaint, Yessenia Rodas Montalvo, would, ultimately, invoke her rights to set forth the truth about her situation. It is believed that no Grand Jury convened to issue the appropriate subpoenas to unveil her anonymity.

70. It became strikingly cruel that Plaintiff could not obtain any neutral investigation or criminal proceedings for her own real complaints over four years (2002-2006) before the Command, IAD or any City of Newark Agency, but, in the end, she was wrongfully terminated for calculated trumped up and exaggerated charges, and just before the top Chain of Command, Anthony F. Ambrose III, Irving Bradley, or others, retired.

71. Even before getting into office, the new Administration promised immediate reinstatement and total changes, but nothing has been done for Rodas since she was terminated at June of 2006.

72. Meanwhile, Rodas proved herself a totally loyal, performing employee, even when she was terminated, and she worked voluntarily on her own time to finish out

14

all the details of graduating 30 new volunteers to serve in the City of Newark's Homeland Security CERT Program. There was no one else qualified for her tasks.

73.    To the very end, Defendants' Officials and agents pulled off vainglorious maneuvers before the public to make themselves look good and they kept up false accusations against Plaintiff so as to justify her termination and to cover-up their own wrongdoing, including stealing of expensive equipment while Plaintiff was out on extended maternity sick leave.

## As to Jose Montalvo

74.    As aforementioned, Plaintiff Montalvo suffered his own severe and pervasive hostile work environment tracing back to Defendant Gagliano's original incident of false reporting of sex between the parties which was totally absurd.

75.    The repercussions and retaliatory activity emerging from the original false charges of former Captain Vincent Gagliano continued to have tremendous impact upon Montalvo's career.

76.    There was a litany of trumped up charges filed against Montalvo.

77.    Additionally, Montalvo was intentionally held back from any advancements or normal financial incentives being offered to other police officers and then he was wrongfully terminated based on discrimination and retaliatory schemes within the Chain of Command.

78.    As aforesaid, Jose Montalvo became separated from his wife, Lillian Mejias, based on her known adultery within Montalvo's own precinct.

79.    Captain Gagliano had openly showed he detested Montalvo and, then, dramatized his animus with a false report of finding Montalvo having sexual relations on

15

the comstat table in the Communications Building, knowing there was no possible truth to the statement.

80.     Those charges were contrived and, then, Jose Montalvo was transferred from the Communications Division to the Cell Block, where he was harassed, mocked and ridiculed, time and time, again.

81.     Montalvo's domestic scene with his wife ended, but there was ongoing reprisal activity linked to the Deputy Chief, Samuel DeMaio, and promulgated by high ranked officers' involvement and with the Internal Affairs Division's agents' support behind it.

82.     Plaintiff Montalvo was disarmed of both personal and duty weapons without a plausible reason or explanation, but for an imagined belief that Montalvo might act as a jealous spouse against the Deputy Chief for his adultery with Plaintiff Montalvo's wife.

83.     For the times Plaintiff Montalvo filed complaints or administrative submissions, his complaints were always ignored.   There followed a severe and extreme hostile work environment likened only to an Hispanic female officer, Yessenia Rodas.

84.     Defendants' Police Department's "official" position with regard to both Montalvo and Rodas' separate adverse treatment, caused by the personal and sexual relationship of DeMaio and Mejias, impacted both their workplace and home.

85.     Further, there was a cover-up by the Employer's agents as if Plaintiffs had no rights nor remedies, even when Plaintiffs raised issues of whether they were victims

of "conduct unbecoming public employees," or of severe discriminatory or retaliatory conduct, or of sexual harassment, or a severe and extreme hostile work environment.

86.     For all these times, Montalvo tried to protect Rodas, practically for lack of choice.

87.     Both Plaintiffs became focused to research regulatory methods and they found there were Executive Directives, Memorandum and Orders issued by the New Jersey Attorney General, or for the Internal Affairs or other City of Newark agencies contemplated for corrective action and discipline. The Internal Affairs Division, the Professional Standards Unit, and other Newark agencies, or John and Jane Does 1-10, would not challenge the Chain of Authority to invoke any protections for them.

88.     Montalvo became totally stuck in a cell block assignment, unarmed, as retaliation activity. He worked a shift from 11:00 P.M. to 7:00 A.M., with no possibility of advancement or working part-time for higher or greater pay. His punishment lasted for almost six (6) years.

89.     During that timeframe, there was a pretext that Plaintiff could not be assigned any weapon, but there was no truth beyond all the Employer's agents' goals to hold Montalvo back in the cell block. Moreover, the Employer's agents wanted Montalvo to resign out of sheer and desperate frustration.

90.     Plaintiff Montalvo was subject to a very long house arrest by reason that he works and lives in Newark and, as an unarmed police officer, he was known to be an available target in the open streets.

91.     Even prisoners that Montalvo dealt with on an everyday basis knew he was vulnerable, without a weapon, and tormented him.

17

92.    The Employer's agents (or Defendants, as named) intentionally became involved to prolong an FBI investigation, initiated six years ago, where Plaintiff was singled out for investigation upon a shooting in 2000.

93.    Assuming Plaintiff was subject to ongoing criminal charges, he would not have remained a police officer without a permanent record of discipline, suspension or termination for five years.

94.    In actuality, Plaintiff was fully investigated by the Essex County Grand Jury, the State Police and the Federal Bureau of Investigation, and no criminal charges were filed against Montalvo nor was he subjected to a criminal or civil trial.

95.    Defendant, Anthony Ambrose III, was informed the Newark Federal Bureau of Investigation, with the concurrence of the U.S. Attorney General's Office, closed down any investigation involving Jose Montalvo.

96.    But for the interference of the named Defendants, the investigation would have been routine. Further, Plaintiff's weapons would have been returned to him in timely manner, not some six years later on December 20, 2005.

97.    For the incident of the 2000 shooting, Plaintiff was cleared of wrongdoing, however, five years later Montalvo was brought up on the original charges and then faced 20 days of suspension, a full month's lost wages.

98.    When Plaintiff's then Counsel argued that the retaliatory charges made no sense by: (i) reason of being dismissed in the past; (ii) no witnesses appeared for the prosecution; and (iii) Plaintiff would have been jailed or been awaiting a criminal trial, the Employer insisted they still could punish Plaintiff although there had been no due process.

99.     It was apparent that Montalvo faced retaliatory activity, but no one intervened to prevent this punishment, particularly John and Jane Does 1-10.

100.    Plaintiff Montalvo obtained 20 days of suspension as pure retaliation for pressing forward his own complaints and a viable notice of claim, and for hiring his own attorney to press forward the instant lawsuit.

101.    The foregoing acts of discriminatory and retaliatory action were done, with malice and a wanton disregard of both victims' personal rights and sensitivities, and with a deliberate foreseeability of intended harmful consequences.

102.    These Defendants, or their agents, were successful in their cumulative and combined efforts to ruin each of these Plaintiffs, personally, and in their careers.

103.    As further proof, Montalvo was suspended for one month, without pay, and, then, informed he was placed on a transfer list to go to the South District, although he had not worked the streets for almost six (6) years.  No efforts were made to retrain him for the rough violence in the streets of the South District.

104.    When Plaintiff's lawsuit was filed, the Employer's agents had run out of excuses to keep Montalvo within their cell block, but they still intended to cause more wrongdoing and make him resign.

105.    Montalvo was actually warned that he would be subjected to further reprisal activity since the Employer's highest agents wanted to terminate him before they retired.

106.    Plaintiff Montalvo remained vulnerable to a discriminatory animus as an Hispanic employee to the very end.  Furthermore, there was always a severe retaliatory

work environment for any challenges he made to Caucasian or Italian police officers' authority.

107.   Through 2006, Plaintiff Montalvo received numerous charges for which there was no probable cause to support a campaign of discipline against him. No matter what he did, he could not invoke any protected status against the adverse work conditions.

108.   The conduct against him was always severe and pervasive enough to make a reasonable Hispanic male believe the condition of his employment had altered, and, the working environment was hostile and extremely abusive.

109.   The Defendants, through their agents, have deliberately contravened the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to 10:5-42 and violated Plaintiffs' rights.

110.   As a proximate result of the foregoing, Plaintiffs have suffered damages, a severe extreme emotional distress, loss of wages, fringe benefits, and promotions, along with qualify of life benefit, which lasted for years.

111.   By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.      Damages, compensatory and punitive and interest accruing;

b.      attorney's fees;

c.      costs of suit;

d.      for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.      for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.      for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.      for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

## SECOND COUNT
### Breach of Contract
### (Violation of Good Faith and Fair Dealing Covenants)

1.      Plaintiffs repeat and reallege the General Allegations and the First Count of the Complaint, as if fully set forth at length herein.

2.      For all times mentioned, Plaintiffs Yessenia Rodas and Jose Montalvo appeared in the Employer's workplace, as Hispanic employees, their rights have been virtually eliminated, time after time, for a continuing violation case.

3.      Plaintiffs are purportedly protected by firm Collective Bargaining Agreements and other regulatory and discipline mechanisms, protocol and procedures developed by the Employer to control their workplace.

4.      Further, the Newark Police Department pretends to put out Director's Memorandum, General Orders and Procedures, and to adhere to Attorney General Guidelines protecting employees in their workplace.

5.      The circulated Memorandum and posted regulatory documentation states that the City of Newark enforces the New Jersey Constitution, U.S. Constitution and other legislative mandates, whether it be pursuant to <u>N.J.A.C.</u> 4A:2-2.3(a), <u>N.J.A.C.</u> 40A:14-118, <u>N.J.S.A.</u> 10:5-1 to 10:5-42, or Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e-1 to 2000e-17. There were even General Orders issuing from the Mayor's Executive Office, and that of the Police Director, pretending to uphold these laws and enforce them.

6.      Defendants (each and everyone) dare to breach provisions of their Agreement, procedures and regulations, in place to protect these Plaintiffs, and then proceeded to cover-up their wrongdoing such that higher government authority, John

22

and Jane Does 1-10, should have intervened to clean up the City of Newark long before this lawsuit was filed.

7.     In all incidents impacting Plaintiffs in their workplace or at home, Defendants, including their Administrators, Chain of Command, John or Jane Does 1-10 (or their agents) have failed to maintain the protocol, rules and regulations for the governing of their police force, Internal Affairs, Professional Standards Unit, Affirmative Action, Medical Services, the CERT Program of Homeland Security, and other Newark agencies pretending to enforce discipline of its members.

8.     As aforedescribed, there has been mixed motives as to why employees like Defendants' or their agents' mistreating Plaintiffs have not been disciplined for conduct "unbecoming a public employee," or, a discriminatory conduct constituting harassment, sexual harassment, or, for a racially hostile or retaliatory hostile work environment.

9.     For years, Plaintiffs have faced trumped up false charges or threats of charges against them that they could do nothing about. The Internal Affairs Division or Professional Standards Unit, or other Newark agencies, always supported the animus of the Chain of Command, and Affirmative Action would do nothing but say it was outside their jurisdiction when complaints were brought to them.

10.    At all times relevant to the within Complaint, the extramarital or sexual/personal relationships within the Chain of Command, has adversely impacted Plaintiffs with foreseeable and known consequences of harm.

11. Moreover, affairs were common knowledge within the workplace, and Hispanic females or black females were often treated as mere chatel or whores of the heirarchy and vulnerable.

12. The discriminatory animus and adverse actions of former Captain Vincent Gagliano, and other higher ranking police officers, including Lieutenant Ronald Kinder, Deputy Chief Kurt Ebler, and others, were rewarded.

13. For instance, Defendant Gagliano was promoted all the way up to Newark Deputy Police Chief, although he deliberately started Plaintiffs' problems and exacerbated their mistreatment.

14. Public investigations have recently revealed that Gagliano was hired, as a felon, and that he should not have even been carrying a gun based on his criminal history from the outset.

15. The City of Newark refused to recognize a "color ladder" or ethnic bar and discriminatory bias filtered into the Plaintiffs' workplace. The Chain of Command used token blacks or Hispanic Officers for their own purposes and the former Mayor would not become involved in exposing wrongdoing.

16. The Plaintiffs were being intentionally victimized and Defendants, or their agents, deliberately aided the commission of torts. It is not ironic that the same Officers kept causing wrongdoing.

17. For times Plaintiffs turned to their precinct or for the Employer's agencies' protection, or filed complaints or administrative submissions and sought intervention to end their discriminatory treatment or retaliatory hostile work environment, they have

24

only faced more reprisal action, or those in sympathy with Plaintiffs, faced reprisal activity for trying to support the Plaintiffs.

18.     There was a conspiracy to commit torts and to cover up the intentional and malicious harm inflicted on Plaintiffs or those who sympathized with them and it started with Defendants Ambrose and DeMaio and filtered down.

19.     The complained of conduct of all Defendants and their agents would not have occurred but for Plaintiffs perceived vulnerability as Hispanic employees and, also, for Rodas being an Hispanic female vulnerable at the outset as a female.

20.     For all times stated, the conduct was severe and pervasive enough, including retaliatory action, to make reasonable (Hispanic) individuals believe the condition of their employment has been altered and they no longer had any civil or constitutional rights or liberties or protection of the City of Newark, despite the printed circulars or posted memorandum, protocol and procedures, or Collective Bargaining Agreements protecting employees.

21.     Police Officers identified by Plaintiffs were higher ranked officers, and they appeared to be beyond investigation or any discipline.   In all events, they were intentionally retained in their high positions, or allowed to retire in good standing so as to go out to other high paying visible employment jobs.

22.     Both Plaintiffs' rights are ignored because they are not Caucasian nor Italian, the preferred profiles by the Chain of Command or City of Newark.

23.     Certainly, Plaintiffs had rights protected within their police functions and they should not have been intimidated in their workplace nor at home.   Moreover, they

had due process and First Amendment freedoms which were violated, as alleged within the Amended Complaint.

24. For all times mentioned, Defendants, including the former Police Director, Anthony Ambrose III, and the Chief of Police, Irving Bradley, John or Jane Does 1-10, including their numerous agents, knew there was an increase in the number of harassment, sexual harassment, and discriminatory complaints received at the Office of Affirmative Action, or other Newark Agencies, from Departmental personnel and their response was to covertly encourage a failure of investigation.

25. This occurred, although the Employer's highest agents have officially recognized, when this form of employee misconduct is permitted, and condoned, by Department personnel, it becomes illegal and a discriminatory condition of employment.

26. The record for these Plaintiffs indicates the Employer condoned and intentionally tolerated the various forms of harassment, whether it be sexual/gender or other ethnic discriminatory and retaliatory adverse conditions within Newark's workplace.

27. From the time of 1990 to this amended pleading, supervisory personnel were responsible for enforcement of Standing Orders, and established standard operating procedures at Newark, for reporting, investigation and resolution of all complaints, like that of the Plaintiffs, but nothing was ever done to provide corrective relief.

28. For years, these Plaintiffs have been adversely treated and such extreme and severe conduct impacted their individual morale, motivation and job performance, although they remained compliant to all their duties.

29.     Plaintiffs have not repeated all the incidents at the General Allegations or the First Count of this Amended Complaint, but they were wrongfully terminated after standing up for themselves and each other, many times, to their detriment.

30.     Notwithstanding the pretense of official written policies, protocol and procedure, Director's Memorandum and the standing General Orders, Defendants kept issuing charges to punish Plaintiffs just to cover-up wrongdoing and silence them.

31.     The foregoing directives and written policies of the City of Newark meant absolutely nothing and were not enforced in Plaintiffs' workplace nor were the State Attorney General's Executive policies enforced.

32.     Defendants, including John and Jane Does 1-10, did not properly train, oversee, supervise or monitor the Newark Police Department operations to prevent the foreseeable harm to these Plaintiffs or otherwise act to protect them.

33.     Additionally, there is the City of Newark Municipal Council's failure to oversee the Newark Police Department in accord with N.J.S.A. 14-118.

34.     There has not been any good faith efforts to comply with the Collective Bargaining Agreement or regarding the protection of civil rights or to prevent discrimination, sexual or other harassment, or retaliation in Plaintiffs' workplace.

35.     As lasting proof, Plaintiffs have not always had due process or been permitted their First Amendment freedoms.

36.     There have been intentional violations of all covenants of good faith and fair dealing

37.     For all these times, Defendants have intentionally breached Plaintiffs' rights and provisions of their Collective Bargaining Agreements, to their detriment.

38.    As a proximate result of the foregoing, Plaintiffs have suffered damages, a severe extreme emotional distress, loss of wages, fringe benefits, promotions, along with qualify of life benefits, for years.

39.    By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.    Damages, compensatory and punitive and interest accruing;

b.    attorney's fees;

c.    costs of suit;

d.    for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.    for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.    for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.    for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.    AND for such other relief as the Court may deem equitable and just.

### THIRD COUNT
### Violation of Civil Rights Leading to Wrongful Termination

1.    Plaintiffs repeat and reallege the General Allegations and the First and Second Counts of the Complaint, as if fully set forth at length herein.

2.    As aforesaid, Plaintiffs respectively obtained trumped up charges before they were wrongfully terminated.

### As to Rodas

3.    In Plaintiff Rodas' situation, she was out on a legitimate extended sick leave due to maternity complications. She had miscarried, lost one triplet, and risked another twin before their birth. Meanwhile, Plaintiff kept receiving threats of discipline charges and then formal charges were held over her head as Defendants planned police trials against her.

4.    Furthermore, Rodas' received an ongoing hostile work environment from Lieutenant Felipe Gonzalez, and, also, from Captain Kurt Ebler of the Professional Standards Unit, Sergeant Sanders and Lieutenant Kowalsky of the Internal Affairs Division.

29

5.      Expensive equipment and monies allocated to the CERT Program disappeared during her extended sick leave. Other Employer's agents were in charge during Plaintiff's absence.

6.      At February 28, 2006, Plaintiff obtained a proper return to work note for the Employer, but was turned away to take her 2005 vacation time through March 20, 2006, although she had been harassed to return.

7.      Plaintiff followed instruction to pick up her work where she left off and she reported to Sergeant Chieppa, who had been charged to run the Unit.

8.      Plaintiff was compelled to work overtime, regardless of her situation with newborn babies at home.

9.      Also, Rodas was compelled to work at 1 Lincoln Avenue, without a Supervisor and she confronted ongoing abuse from Lillian Mejias, who made comments directed to her.

10.     All the office equipment, along with files, had been taken from Plaintiff's office in her absence. Plaintiff was informed that Sergeant Farina was charged to maintain all the equipment, files and inventory in her absence.

11.     Said Sergeant was contemplated to fully return everything he held for the CERT program, but he failed to do so. A week went by and Plaintiff still had no computer equipment or files and she had already begun recruiting for the CERT 8 Class.

12.     Plaintiff submitted a DPI 1001 for missing equipment after learning that it was actually Detective Janeth Murillo who should have retained all the expensive equipment and inventory. It seemed that grant money ($5,000), equipment monies

30

($1,500), along with 10 Motorola radios and a $1,500 camera could not be accounted for.

13.     Plaintiffs report was duly submitted to Director Malanga and Sergeant Chieppa, but, once again, the Internal Affairs Division became involved and insisted that Plaintiff was strictly blameworthy for the missing equipment, inventory, and monies allocated to the CERT program.

14.     Plaintiff faced the threat of charges for months until she was wrongfully terminated.

15.     By March 31, 2006, Plaintiff found that she was being investigated by Internal Affairs, but beyond the equipment, inventory or lost grant monies.

16.     Plaintiff was ordered to go to IAD and Sergeant Sanders and Lieutenant Kowalsky began to interrogate her without any notice that there was a criminal matter pending.

17.     Plaintiff Rodas was not given *Garrity* or any notice that she would be compelled to give statements against her spouse or anyone else.

18.     Rodas was completely puzzled and overwhelmed that there was such an animus aimed directly to her or her spouse during this interrogation process. Rodas knew her husband's life was threatened when a bounty was placed on his head and the situation was frightening for both of them. Further, she knew her husband was flatly turned down for a criminal investigation and thought it was over.

19.     Meanwhile, she was forced to answer questions pertaining to activity outside the scope of her work or duties.

31

20.    Plaintiff made plain she wanted to invoke her First Amendment rights and protect her freedom of speech, as the questions became more difficult and compromised her rights.

21.    The interviews became more formal and the interrogators kept changing as Plaintiff was compelled to attend Internal Affairs meetings.  For times mentioned, there was never any notice of criminal matters nor *Garrity* application nor due process.

22.    Plaintiff tried to indicate that she was still on psychotropic medications prescribed by her physicians and could not handle these interviews calculated to wear her down or which violated her civil rights.

23.    Defendants' agents ignored Plaintiff's rights in each instance.  Plaintiff was always coerced to answer questions against her interest and in violation of her civil rights.

24.    By June 21, 2006, Plaintiff was established for a police trial and counsel appeared on her behalf to protest the violations of her civil rights intentionally committed by Defendants' agents from Newark agencies and, more specifically, from the IAD by Lieutenant Kowalsky, Sergeant Leraux, Sergeant Sanders or others from the Professional Standards Unit.

25.    Rodas' legal Counsel questioned the Employer's agents' ability to coerce answers and indicated that Rodas' state of mind and mental stability were not sufficient for any interview or forced interrogation process.

26.    At June 29, 2006, Defendants' agents, Roman and Lopez, arrived at Rodas' home to collect her gun and badge and inform her that she was terminated, just

as she feared.  The advance warning, before Anthony Ambrose and Irving Bradley retired, she would be terminated had come true, exactly as predicted.

27.     Defendants intentionally caused the termination of Rodas as their last vendetta and then ensured that same would occur to her spouse, Jose Montalvo.

28.     Immediately prior to Plaintiff's termination, there was a CERT class in progress with 30 volunteers that would be graduated for July 5, 2006.  No one from Homeland Security had arranged for any ceremony.

29.     Rodas completed her duties and finalized all arrangements for the Office of Homeland Security despite the fact that she was terminated.  Others in charge, tried to sabotage arrangements for the graduation ceremony, but it was concluded with successful results.

30.     During the ceremonies, Plaintiff Rodas was threatened that she would be arrested, although she was compliant to directives.  She was not permitted to participate in the party arrangements, at all, and she left quietly.

31.     To the very last moment, Rodas was harassed and humiliated.  First, the Officers pretended she held onto the Employer's laptop, although it was her own property.  Then, she turned in a projector and Lieutenant Kinder would not even give her a receipt.  Lieutenant Kowalsky taunted her that he would videotape her return of the projector.

32.     Meanwhile, this Plaintiff was not compensated for her work and appeared on a voluntary basis because the graduation ceremonies were not prearranged by other working employees.

33.    Rodas' privacy continued to be compromised when Detective Rodriguez appeared at her home insisting she respond to further interrogation regarding the missing equipment that occurred during her maternity leave.

34.    Thereafter, Rodas was also followed by Defendant, Kurt Ebler, for practically a whole day, as she proceeded to her own personal tasks through New Jersey.

35.    The intrusion and deliberate invasion of her privacy was not possibly warranted. Plaintiff was no longer an employee of the City of Newark.

### As to Montalvo

36.    As aforesaid, Plaintiff Montalvo obtained 20 days of suspension as pure retaliation for pressing forward his own complaints of adverse conditions pertaining to him and his spouse, including a notice of claim and lawsuit.

37.    Other government agencies had already cleared Plaintiff Montalvo of wrongdoing, but it did not seem to matter.

38.    This Plaintiff was not even given the opportunity to testify in a police trial and to confront the allegations against him.  There was not due process nor any witnesses against him.

39.    The aberrant result was a failure to give him a police trial and the 20 days suspension occurred. The Trial Board made the decision and they were appointed by the Defendant, Anthony Ambrose, and acted on his instructions against the interests of Montalvo.

40.     All that time, Montalvo kept insisting that he was entitled to a full Police Trial and to confront witnesses, but no trial occurred. Instead, there was punishment where he lost a full month's pay.

41.     The situation of a wrongful termination scheme kept brewing against Montalvo in a similar manner to that of Rodas.

42.     Montalvo, like other public employees, knew of the internet blog known as Newark Speaks. The same was roundly discussed in the workplace and at Union meetings and elsewhere. Indeed, Officers throughout Newark were utilizing this blog.

43.     Montalvo assumed that he had rights to remain anonymous if he ever participated and, more particularly, for times he was at home and not possibly working.

44.     There came a time during March of 2006 that Montalvo learned a bounty had been placed on his head. The same was being discussed over the internet. Montalvo wanted to initiate a criminal complaint and he went to Lieutenant George Alberto at the front desk of his Command to file a criminal complaint. He was flatly turned down.

45.     The Chain of Command initiated their own vendetta to determine the full source of identities of individuals involved on Newark Speaks. Irregular (illegal) and invasive subpoenas issued, contrary to Plaintiffs' rights to determine whether they were involved on Newark Speaks.

46.     The City of Newark, through their agents, maliciously abused the lawful processes to prosecute Plaintiffs, but, significant for this Court proceeding, they intentionally removed all evidence of those (or other) IAD investigators, who had posted remarks like the Plaintiff.

47.     Further, there was a total abuse of authority as Grand Jury subpoenas were issued to identify them as individuals on the website.

48.     The Internal Affairs Division and Professional Standards Units' employees conspired, along with the Chain of Command, to go beyond their authority.

49.     Indeed, it was always the same Employer's agents, Sergeant Sanders and Lieutenant Kowalsky, from the IAD, who were assigned, purposely, from the Chain of Command. Defendant Ambrose could rely on these agents to follow his directives for cover-up and wrongdoing.

50.     Upon information and belief, Superior Court Judge(s) in Essex County denied the possibility of violating Plaintiffs' rights. Thereafter, these agents turned to the Essex County Prosecutor's Office (John Wojtal, Esq.) of the Professional Standards Bureau, to issue Grand Jury subpoenas without even convening a Grand Jury.

51.     There was no probable cause for such invasive tactics and violation of Plaintiff's rights. They did not check their constitutional freedoms at the front door of the their Employer when they agreed to become public employees.

52.     At these times, there were no criminal proceedings and Defendants purposely manipulated events, refusing Montalvo's complaint, so as to set up an administrative investigation.

53.     Thereafter, Montalvo became subject to interrogation proceedings, although he was never advised of any criminal proceedings or the *Garrity Rule*. He was called in four times and he tried to invoke his rights in each instance.

54.    Montalvo like Rodas was only informed:    "This was a administrative proceeding, and, if he did not respond to questioning, he would be automatically suspended or terminated.    That was to be the final result for him."

55.    Video recordings were made when both Plaintiffs' rights were being violated and they were coerced into statements against each other as husband and wife and/or into illegal statements.

56.    All video and other statements must be deemed subject to discovery in the instant litigation, along with the illegal opportunities advanced by the City of Newark to invade their rights through Yahoo, AOL, Verizon, Comcast, Optimum Online, Cablevision, and other entities.

57.    Charges followed, although Montalvo cooperated just like his wife.    Daniel Mejias was found to have tried to collect a bounty placed on Montalvo's head and he still has a pending Police Trial, but Montalvo was terminated with an expedited Police Trial by August 25, 2006.

58.    No one from the City of Newark wanted to know the source of the bounty, which threatened Montalvo's life, but he was intentionally punished and left without any protection or respect for his rights.

59.    A General Order exists for threats on Police Officers' lives, and it was intentionally ignored in the situation of Montalvo, when a criminal complaint should have been processed for him.

60.    Moreover, Montalvo should have obtained automatic police protection for him and his family, and he should have been placed on administrative duty, but he was left on the streets to work, sometimes, alone.

61. The Employer's agents finally allowed Montalvo and Rodas to proceed to criminal complaints within the Municipal Court forum, but only after they concluded their administrative proceedings. (Their goal was to invade Plaintiffs' rights and to limit their remedies.)

62. Nothing has ever been done in the City of Newark Municipal Courts, except to postpone Plaintiffs' cases against Daniel Mejias and that also appears to be deliberate stonewalling through the higher authorities and Chain of Command. (Internal Affairs refuses to turn over any discovery.)

63. In the end, Plaintiffs, respectively, faced wrongful termination based on trumped up charges.

64. Simply put, Montalvo wanted a proper criminal investigation and possibility of his own complaint or prosecution to occur and he would have cooperated from the outset, but knowing that he was being set up to incriminate himself, he did not want to give up his rights.

65. Defendants, through their agents, have deliberately contravened Plaintiffs' constitutional rights, including the First Amendment, freedom of speech, in their own private home.

66. As a proximate result of the foregoing, Plaintiffs have suffered damages, a severe extreme emotional distress, loss of wages, fringe benefits, promotions, along with qualify of life benefits, for years.

67. By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregeous, in

contradiction to known civil or constitutional rights, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a. Damages, compensatory and punitive and interest accruing;

b. attorney's fees;

c. costs of suit;

d. for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e. for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f. for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g. for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the

Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

    h.    AND for such other relief as the Court may deem equitable and just.

**FOURTH COUNT**
**Conspiracy to Commit Crimes, Torts or**
**Aid the Commissions of Crimes or Torts**

    1.    Plaintiffs repeat and reallege the General Allegations and the First, Second and Third Counts of the Complaint, as if fully set forth at length herein.

    2.    For the relevant times, Plaintiffs were assigned to their Police Precinct, in their separate roles and functions, and they did not provoke misconduct, violation of the Command rules or Supervisor's protocol, or violate regulations of Internal Affairs, Professional Standards, Affirmative Action, or any other Newark agency.

    3.    The Employer has not provided nor maintained any healthy professional work environment, free from false accusations, sexual or other harassment, retaliatory misconduct, or intimidation of Plaintiffs in their work performance and, also, at their homes for years.

    4.    In point of fact, Plaintiffs have been compelled to submit as  victims to discriminatory animus used as a basis for altered terms and conditions of their employment and, also, as a basis for ongoing adverse or retaliatory employment decisions against them.

    5.    For years, Plaintiffs have been targeted with false or trumped up accusations, and they have tried to complain, without any remedy or relief.

    6.    For incidents, as aforedescribed, each Plaintiff has been bullied or intimidated and there has been assault, battery or other criminal behavior or offenses,

40

and Plaintiffs' rights have been constantly ignored. There was an intentional cover-up activity or retaliation charges, or threats of charges, against Plaintiffs, instead of punishing the actual wrongdoers.

7. For the times Plaintiffs should have been subject to confidentiality or investigation of complaints, their privacy and reputation has been exploited by the Employer's agents to the fullest extent possible to ruin them as credible victims.

8. Certainly, the Employer's agents were advised, or should have been trained, to know the proper parameters of a fair investigative process, including retaliation, protection of the parties, confidentiality, privacy and to preserve the reputation of the Plaintiffs/victims and to take remedial action to correct wrongdoing imposed against Plaintiffs, but no agent of the Employer acted in such manner, ever.

9. There was never any recognition of the Plaintiffs' rights of any kind, nor to discipline the wrongdoers with suspension, with or without pay, termination, referral to the criminal justice system for prosecution, despite the outrageous and egregious actions, inactions, omissions and discriminatory malfeasance of Defendants and their agents, as aforedescribed.

10. As aforesaid, Plaintiffs' civil rights, constitutional rights and freedoms to free speech in their homes were totally ignored.

11. Defendants (any or all of them), including John and Jane Does 1-10, neglected their own duties and kept covering up wrongdoing, but there were promotions or rewards which followed for aiding the commission of these torts or a conspiracy occurred for criminal offenses, as aforedescribed, up and down the Chain of Command and through other agencies of the Employer.

12.     Notwithstanding the wrongdoing of Lillian Mejias, she was promoted to Acting Detective Sergeant and receives the higher pay and benefits for higher rank. Other wrongdoers are intentionally retained or permitted to retire with full benefits of their long employment.

13.     There was not proper legal authority, legal justification or probable cause for Defendants' intentional conspiracy activities, to separately taunt, torment and severely harass these Plaintiffs or cause a severe and extreme hostile work environment.

14.     The aforenamed Defendants, and their agents, aided, abetted, assisted, and knowingly committed to unlawfully harm the Plaintiffs. Furthermore, the Defendants have tried to establish false evidence against the Plaintiffs knowing, or, should be knowing they were always innocent parties.

15.     As a Police Officer, Montalvo was entitled to police protection when his life was threatened. There are General Orders to same effect, but Montalvo and Rodas suffered hyped up interrogation calculated to ruin their careers, and their rights were violated, in each instance.

16.     For all times mentioned, each Plaintiff suffered harassment, ridicule and intimidation. They were threatened with suspension or termination, or that their police careers would be effectively ruined by the Defendant Officers, or their agents of the Internal Affairs Division, and elsewhere, and those facts occurred.

17.     Moreover, the same IAD Supervisors, Lieutenant Kowalsky and Sergeant Sanders kept covering up wrongdoing against Plaintiffs for the Chain of Command, Defendants Ambrose, Bradley, DeMaio and others.

42

18.     Recent public investigations have revealed that the now Newark Deputy Police Chief, Vincent Gagliano, was hired, as a felon, and that he should not have even been carrying a gun based on his criminal history. It was Gagliano who initiated the problems against Plaintiffs, but the Chain of Command sanctioned his wrongdoing. Furthermore, Defendants Ambrose, Bradley and DeMaio, purposely caused both Plaintiffs' termination schemes and adverse determinations.

19.     The combination of Defendants in a conspiracy was purposeful and common design to perpetrate torts for unlawful purposes, and by purposes achieved by unlawful means, including multiple Grand Jury subpoenas for such severe or extreme abuse. Plaintiffs were deliberately targeted as vulnerable Hispanic Police Officers.

20.     Each and every member of this conspiracy to commit torts or aid the commission of the torts are equally and vicariously liable to the Plaintiffs for causing them damages, and, special damages.

21.     Defendants (each and everyone) proximately caused adverse results by their tortious, overt and covert acts, in furtherance of the conspiracy; and the Defendant Employer is, and, remains, liable to Plaintiffs, *respondent superior*.

22.     Defendants, City of Newark (through its agents) and including John and Jane Does 1-10, was possessed of full knowledge of the material facts seriously contemplated to harm these Plaintiffs and did nothing to oversee their Police Department operations or that of their specialized units.

23.     In the final analysis, Plaintiffs were planned to suffer as victims like any common criminal although they were uniformed officers with good performance records for years and dedicated employees.

43

24.     As a proximate result of the foregoing, Plaintiffs have suffered damages, a severe extreme emotional distress, loss of wages, fringe benefits, promotions, along with qualify of life benefits.

25.     By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.     Damages, compensatory and punitive and interest accruing;

b.     attorney's fees;

c.     costs of suit;

d.     for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.     for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.     for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.      for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

### FOURTH COUNT
### Intentional Failure To Properly Train And Supervise
### Or To Oversee Police Department Activities

1.      Plaintiffs, Yessenia Rodas and Jose Montalvo, repeat and reallege the General Allegations and the First, Second and Third Counts of the Complaint, as if fully set forth at length herein.

2.      The Defendants, City of Newark and/or John Does 1-10 knew, or, should have known, and monitored how the Defendant Officers proceeded for Plaintiffs in regard to their issues and complaints. Under all circumstances, there should have been proper procedures and protocol in place to protect City of Newark police officers like the Plaintiffs Rodas and Montalvo.

3.      As aforedescribed, Plaintiffs suffered by the City of Newark's (or John and Jane Does 1-10) failure to oversee and monitor the Police Department in accord with N.J.S.A. 40A:14-188 or other statutory authority and contracts with the Union.

4.      All Defendants' agents (up and down the Chain of Command) should have been properly trained for assignment, and, further, for roles in the Internal Affairs,

Professional Standards, or Affirmative Action Units, Medical Services or CERT Program for Homeland Security, but there has been blatant intentional departure from proper training and any supervisory controls or command by reason of wrongdoing from the top.

5.     This has seriously impacted Plaintiffs' rights as both citizens, and as uniformed Police Officers protected by statutory and constitutional dictates.

6.     For all relevant times, there was a malicious and wanton, reckless harm calculated to seriously and negatively impact the Plaintiffs standing amongst their fellow officers, peers and supervisors to permanently ruin them.

7.     Defendant, City of Newark, through its agents, or John and Jane Does 1-10, were possessed of knowledge of the material facts seriously contemplated to harm these Plaintiffs and did nothing to oversee their Police Department operations or that of their specialized units, although Plaintiff Rodas was chosen to work for the very important Homeland Security Unit, know as the CERT Program.

8.     Plaintiffs were planned to suffer as victims like any common criminal although they were uniformed officers with good performance records for years and dedicated employees before this happened to them.

9.     Plaintiffs suffered the original humiliating and harassing activities, and, then, there was institutional reprisal with deliberate, malicious or wanton disregard of their personal rights and sensitivities as their reputations became ruined with false Departmental charges being made part of their permanent records.

10.     The foregoing has become common place at the City of Newark, a pattern and practice of abusive activity by City of Newark agencies and the Chain of Command.

11.     Plaintiffs seek damages and punitive damages based on the foregoing malice, wanton disregard of their rights as victims and based upon the foreseeability of the harmful consequences to each of them.

12.     As aforesaid, the Plaintiffs confronted trumped up charges and ended with permanent discipline records, contrary to all the named Defendant Officers who actually pursued a conspiracy of wrongdoing from one incident to the next.

13.     Defendants, John and Jane Does 1-10, or other Defendants' agents, deliberately turned a deaf ear to any proper investigation of wrongdoing causing intentional emotional distress to the Plaintiffs.

14.     Strong messages have been sent out to the workforce that officers like the Plaintiffs have absolutely no rights to question their superiors' actions, malfeasance or a conspiracy of any kind.

15.     Moreover, the Defendants', or their agents, can willfully and wantonly abuse anyone they want to target without fear of discipline, even if they impose discriminatory or retaliatory action and that has been the fate of these Plaintiffs. The final message is that these Plaintiffs were terminated and no one could or would protect them.

16.     As a proximate result of the foregoing, all Defendants, including the City of Newark, John and Jane Does 1-10, and those named, remain liable to Plaintiffs, jointly and severally; and Plaintiffs seek damages for severe and extreme emotional distress, loss of wages, fringe benefits, promotions, along with qualify of life benefits.

17.     By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction

47

to established protocol and procedures, Plaintiffs seek all damages, including compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.    Damages, compensatory and punitive and interest accruing;

b.    attorney's fees;

c.    costs of suit;

d.    for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.    for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.    for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.    for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the

48

Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

      h.     AND for such other relief as the Court may deem equitable and just.

## FIFTH COUNT
## Defamatory Injury To Reputation

      1.     Plaintiffs, Yessenia Rodas and Jose Montalvo, repeat and reallege the General Allegations and the First, Second, Third and Fourth Counts of the Complaint, as if fully set forth at length herein.

      2.     Defendants through their agents have made false, defamatory statements of fact concerning the Plaintiffs and even their private sensitivities have been published.

      3.     In all instances, starting from the first Internal Affairs investigation, the outcome was predictable to cover-up any search for truth.

      4.     Defendants (through their agents) have aided each other in their disloyalty to Plaintiffs, who were known to have clean reputations unmarred by serious discipline history, but, now, their respective records have adverse discipline and prove wrongful termination was their final fate and they are still fairly young individuals trying to raise their family, together.

      5.     Defendants (through their agents) have intentionally misstated the facts leading to such discipline, and acted in reckless disregard of its truth or falsity.

      6.     All statements regarding the Plaintiffs were not possibly made for a common interest or communicated under any reasonable belief that the Plaintiffs would not be harmed.

      7.     Defendants (through their agents) deliberately breached any policy of good faith and fair dealing such that the Plaintiffs fear that they are, and, shall remain,

forever compromised within the community at large knowing they were wrongfully dismissed and dishonored, each of them.

8.      Plaintiff Rodas' physicians put her out on sick leave due to her severe emotional upset while she was pregnant, and thereafter, for a period of time. Rodas lost one of her triplets and another fetus remained at risk and their young family became totally compromised.

9.      Plaintiff, Jose Montalvo, persisted in a situation of tormenting defamatory remarks, slanderous *per se* without any corrective remedy for years, as he tried to remain a loyal employee. He was punished years later for an incident cleared by three other government authorities, and, the only situation left available to him was an internet blog to air grievances and complaints for himself and his spouse, since no one would abide Newark written regulatory discipline mechanisms for wrongdoing being imposed on them.

10.     By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including special, compensatory and punitive.

11.     The community at large knows of their dishonored status and wrongful termination.

WHEREFORE, Plaintiffs demand judgment for:

a.      Damages, compensatory and punitive and interest accruing;

b.      attorney's fees;

c.      costs of suit;

d.      for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.      for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.      for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.      for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

h.      AND for such other relief as the Court may deem equitable and just.

## SIXTH COUNT
## Intentional Infliction of Emotional Distress

1.      Plaintiffs repeat and reallege the General Allegations and the First, Second, Third, Fourth and Fifth Counts of the Complaint, as if fully set forth at length herein.

2.      The conduct of the Defendants, City of Newark, Police Director Anthony Ambrose, the Chief of Police Irving Bradley, Captain Vincent Gagliano, Deputy Chief Samuel DeMaio, Detective Lillian Mejias, Lieutenant Ronald Kinder and Deputy Chief Kurt Ebler, and others, John and Jane Does 1-10, has been outrageous and extreme.

3.      As aforementioned, the Plaintiffs married and they tried to start a family. Rodas was caused to go out on extended sick leave for high risk pregnancy complications, which emerged from the torment and emotional distress within the workplace.

4.      Each party was constantly burdened with the upset of the other party.

5.      Plaintiff Rodas was constantly harassed at home, although she was within her rights to be at home on extended sick leave.

6.      The Employer's agents knew, or should know, they could not harass an employee out on sick leave after a certain number of days on a physician's notation.

7.      Plaintiff became so emotionally distraught by reason of the foregoing that she went into labor and her twins had to remain in the hospital for almost a month by reason of their compromised status and Rodas was devastated, along with Montalvo.

8.      Rodas miscarried what would have been her triplet, as a result of the assault by Lillian Mejias, and other stress.  Both Plaintiff's were devastated.

9.      The aforementioned intentional conduct of the Defendants, City of Newark, Police Director Anthony Ambrose, the Chief of Police Irving Bradley, Captain Vincent Gagliano, Deputy Chief Samuel DeMaio, Detective Lillian Mejias, Lieutenant Ronald Kinder and Deputy Chief Kurt Ebler, and others, John and Jane Does 1-10, caused Plaintiffs to suffer severe extreme emotional distress.

10.     The said conduct of the Defendants, City of Newark, Police Director Anthony Ambrose, the Chief of Police Irving Bradley, Captain Vincent Gagliano, Deputy Chief Samuel DeMaio, Detective Lillian Mejias, Lieutenant Ronald Kinder and Deputy Chief Kurt Ebler, and others, John and Jane Does 1-10, was calculated to cause and, in fact, did cause Plaintiffs to suffer permanent severe emotional distress.

11.     By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction to establish protocol and procedures, Plaintiffs seek all damages, including special, compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.      Damages, compensatory and punitive and interest accruing;

b.      attorney's fees;

c.      costs of suit;

d.      for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.      for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented

against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f. for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g. for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the Professional Standard Unit, Medical Services, or other individuals with animus within the Chain of Command;

h. AND for such other relief as the Court may deem equitable and just.

## SEVENTH COUNT
## Spouse Burdened By Injury To Other Spouse
### (Per Quod Claim)

1. Plaintiffs, Jose Montalvo and Yessenia Rodas, repeats and realleges the General Allegations and the First, Second, Third, Fourth, Fifth and Sixth Counts of the Complaint, as if fully set forth at length herein.

2. Yessenia Rodas and Jose Montalvo became married and started a family together.

3.      Each Plaintiff has become injured and burdened as a proximate result of the adverse mistreatment of the other.    Both parties have alternated becoming emotionally despondent.

4.      Plaintiff Rodas miscarried one of her triplets because of the extreme and severe hostile work environment imposed and another fetus was also at risk. She was harassed at home by Defendants' agents contacting her several times each day for no apparent reason but to frighten and intimidate her when she was contemplated to be stress-free.

5.      Meanwhile, Plaintiff Montalvo was harassed, himself, with incidents, charges and police trials calculated to make each of them upset and resign.

6.      They were separately burdened by charges and police trials, as an aspect of discriminatory action and retaliation for their complaints, or for standing up for themselves or each other.

7.      Both Plaintiffs ultimately suffered separate wrongful termination schemes against their rights.

8.      Defendants should be held liable for all the reasonable expenses incurred for the past, present and future care, treatment and cure of the Plaintiffs, and for any loss or impairment of his or her spouse's services, society or sex due to the harm or injuries, including loss of life and the grief that resulted therefrom for all times mentioned in this Amended Complaint.

9.      By reason that Defendants' agents' actions were intentionally malicious, retaliatory and officially sanctioned, although outrageous and egregious, in contradiction

to establish protocol and procedures, Plaintiffs seek all damages, including special, compensatory and punitive.

WHEREFORE, Plaintiffs demand judgment for:

a.     Damages, compensatory and punitive and interest accruing;

b.     attorney's fees;

c.     costs of suit;

d.     for a Declaratory Judgment stating that the City of Newark must take action immediately to reinstate Plaintiffs;

e.     for a Declaratory Judgment stating that City of Newark must protect these Plaintiffs against any further reprisal activity, adverse treatment, disparate treatment or impact and otherwise protect against a discriminatory bias program being implemented against Yessenia Rodas and Jose Montalvo, contrary to the New Jersey LAD or other statutory or contract provisions;

f.     for a Declaratory Judgment for the City of Newark to take specific corrective action against those who have deliberately utilized their authority to harm Plaintiff in the workplace, including Vincent Gagliano, Samuel DeMaio, Lillian Mejias, Anthony Ambrose, Irving Bradley, Ronald Kinder, Kurt Ebler, and John and Jane Does 1-10;

g.     for a Declaratory Judgment for the State of New Jersey to intervene and assume control over all operations of the Internal Affairs Division, Professional Standards Unit, and their Police Precincts so as to effectuate serious non-discriminatory, non-retaliatory changes and to protect Plaintiffs Yessenia Rodas and Jose Montalvo from present governing agencies, the Internal Affairs Division, the

Professional Standard Unit, Medical Services, or other individuals with animus within

the Chain of Command;

   h.  AND for such other relief as the Court may deem equitable and just.

## **JURY DEMAND**

  Plaintiffs hereby demand a trial by jury on all causes of action.

Dated: October 6, 2006    Law Offices of
              WENDIE L. ELOVICH, P.A.
              Attorney for Plaintiffs


              By: /s/Wendie L. Elovich
                WENDIE L. ELOVICH, ESQ. (8743)
                180 White Road, Suite 204
                Little Silver, New Jersey   07739
                (732) 842-3224


## **DESIGNATION OF COUNSEL**

  Pursuant to Rule 4:25-4, WENDIE L. ELOVICH, ESQ. is hereby designated as

Trial Counsel for the Plaintiffs in the within matter.

Dated: October 6, 2006    Law Offices of
              WENDIE L. ELOVICH, P.A.
              Attorney for Plaintiffs


              By: /s/Wendie L. Elovich
                WENDIE L. ELOVICH, ESQ. (8743)
                180 White Road, Suite 204
                Little Silver, New Jersey   07739
                (732) 842-3224

## CERTIFICATION

Pursuant to Rule 4:5-1 the undersigned certifies that this matter in controversy is not the subject of any other action pending in any Court of Arbitration forum, nor is any other action or Arbitration proceeding presently contemplated and all known parties have been joined in this action.

Dated:   October 6, 2006

Law Offices of
WENDIE L. ELOVICH, P.A.
Attorney for Plaintiffs


By: /s/Wendie L. Elovich
WENDIE L. ELOVICH, ESQ. (8743)
180 White Road, Suite 204
Little Silver, New Jersey   07739
(732) 842-3224

## CERTIFICATION OF VERIFICATION AND NON-COLLUSION

1.     I am the Plaintiff in the foregoing Complaint to which this is annexed.

2.     The allegations of the Complaint are true to the best of my knowledge and belief.
       The Complaint is made in truth and good faith and without collusion for the acts
       set forth therein.

I certify that the foregoing statements made by me are true.  I am aware that if any of
the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  October 6, 2006

_____
JOSE MONTALVO

## CERTIFICATION OF VERIFICATION AND NON-COLLUSION

1.     I am the Plaintiff in the foregoing Complaint to which this is annexed.

2.     The allegations of the Complaint are true to the best of my knowledge and belief. The Complaint is made in truth and good faith and without collusion for the acts set forth therein.


I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  October 6, 2006

YESSENIA RODAS