there were two positions.   When Director McCarthy became appointed and reorganized, he eliminated the Chief, and the City Administration approved it.   (Ordinance and Resolution occurred.)   From 2006 to 2010, the (new) Police Director intentionally took no action for the reinstatement of Jose Montalvo.   It was still Samuel DeMaio and other Supervisors in the Command, playing out their reprisal against Jose.   Today, it is still only the Director of Police, McCarthy, who will have the final authority to reinstate Montalvo, decide past losses, NPD pension contribution and, also, finally allow the appropriate promotion to go forward based on past eligibility, which is required of him in his complete role as the Commander.

## LEGAL ARGUMENT

## POINT I

## PLAINTIFF CAN DEMONSTRATE THE EXISTENCE OF ISSUES OF GENUINE MATERIAL FACT FOR TRIAL.

Summary judgment is appropriate only when the admissible evidence fails to demonstrate a dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When the moving party does not bear the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing the non-moving party's evidence is insufficient to carry its burden of persuasion at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-324 (1986).  Therefore, the non-moving party creates a genuine issue of material fact if sufficient evidence is provided to allow a reasonable jury to find for them at trial.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  Further, in reviewing the record, this Court must give the non-moving party the benefit of all reasonable influences.  Josey v. John R. Hollingsworth Corp., 996 F. 2d 632, 637 (3d Cir. 1993); Gray v. York Newspapers, Inc., 957 F. 2d 1070, 1077 (3d Cir. 1992); Chipollini v. Spencer Gifts, Inc., 814 F. 2d 893, 900 (3d Cir.) (en banc), Cert. Dismissed, 483 U.S. 1052 (1987) discussing the impropriety of credibility determinations on summary judgment; and Sempier

v. Johnson & Higgins, 45 F. 3d 724, *Reh'g Denied*, 1995 U.S. App. Lexis 2927 (3d Cir.), *Cert.*
*Denied*, 1995 U.S. Lexis 4307 (1995).

Moreover, to defeat any summary judgment motion based on a Defendant's proffer of a
nondiscriminatory reason, a Plaintiff who has made out a prima facie showing of discrimination
need only point to evidence establishing a reasonable inference that the employee's proffered
explanation is unworthy of credence. Fuentes v. Perskie, 32 F. 3d 759, 764 (3d Cir. 1994). A
Plaintiff is not then required to produce evidence, which necessarily leads to the conclusion that the
employer did not act for the nondiscriminatory reasons. Sorba v. Pennsylvania Drilling Co., 821 F.
2d 200, 205 (3d Cir. 1987), *Cert. Denied*, 484 U.S. 1019 (1988).

The remaining Plaintiff can carry his burden to make a strong showing sufficient to establish
the existence of every element essential to his case on all Counts of his Amended and Retaliation
Complaints, respectively Exhibits A and B to Plaintiff's Aff. in Opp. There are issues of genuine
material fact for trial Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). Plaintiff does not present a
dispute over irrelevant or unnecessary facts. Fed. R. Civ. P. 56(e), and, see Curley v. Klem, 298
F.3d. 271, 276-77 (3d.Cir. 2002). Rather, this Plaintiff culled the entire record to identify genuine
material factual issues sufficient to defeat the Motion. Morris v. Orman, No. 87-5149, 1989 WL
17549 at *8 (E.D. Pa. Mar. 1, 1989) citing Childers v. Joseph, 842 F.2d. 689 (3d. Cir. 1988);
Atkinson v. City of Phila., No. 99-1541, 2000 WL 793193 at *5 n.8 (E.D. Pa. June 20, 2000).

**A.    The Defense Disregards Submissions Of Fact And The Sheer
Volume Of IOP's And CAP's Being Produced By the Plaintiff And
The NPD From Montalvo's Personnel Record Relevant To This
Ongoing Litigation.**

It is highly noticeable that the defense argument, resting on fourteen facts, harks back to a
litany of purported discipline to carry weight with the Court from **1992 to 2000**. The obvious goal
is to persuade this Court Jose Montalvo is a longstanding 'bad cop,' who has been tolerated into

**2006** when he 'magically' becomes terminated.  Their Advocate pretends it is Montalvo's fault, and the NPD leniency, that he obtained a permanent status at the Cell Block.  This hardly makes sense in light of all the long testimony.  By reason of this long Brief, more testimony is at the Reply.

The defense blatantly waives time limitations, and it is in Plaintiff's favor to detail the past incidents for Montalvo subjecting him to a discriminatory hostile work environment severe or pervasive enough to create a work environment under the NJLAD framework.  Over four years, Plaintiff produced Answers to Interrogatories (Exhibit SS), Supplements to Interrogatories (Exhibit TT) and numerous Responses to Production.  Also, Jose was compelled to appear for deposition over two days.  Yessenia testified during four separate days for him.

1.  **There Cannot Be Any Contest That This Material Exists For Trial. But Most Facts And All The Material Proofs Were Ignored By The Defense To Make Their Argument.**

The below-written was shown at Plaintiff's Answers to Interrogatories, No. 14, to establish the below material existed to prove Jose's facts of a hostile work environment existing for years:

> **Incidents for Jose Montalvo:**
> **Shooting Incident/Arrest:  IOP #96-114**
> **Also, see Investigation IOP #00-081, CAP# 00-406**
> Investigative submission, 3/6/96, IOP#96-114
> **Administrative submission**, Montalvo to Captain Grill, 2/12/96
> Administrative submission, Sgt. Bryant to Captain Colonnello, 2/28/96
> Administrative submission, Sgt. Alberto to Lt. Rox, 2/28/96
> Administrative submission, P.O. Gonzalez to Capt. Borrelli, 2/28/96
> Administrative submission, P.O. Ferreira to Capt. Borrelli, 2/28/96
> Prelim. Interview Report, 1/29/96
> Memorandum, Capt. Grill re Montalvo, 2/6/96
> Administrative submission, Capt. Grill to Dep. Chief, 3/13/96
> Memorandum, 96-10, Chief to Police to Dep. Chief, 2/2/96
> Disposition, Internal Affairs, 1/29/96
> Case Management, 1/29/96
> Offense Incident Report, 1/24/96
> **Revenge from Lillian Mejias and use of her influence within the Chain of Command to cause adverse action and harm to Plaintiffs:**
> **Outside Employment Request Form at 3/20/96**
> **Incidents beginning with the newly promoted Sgt. Gregory Meehan, who ultimately ran operations for the Employer's Human Resources Department – Uniform Hat incident**
> Investigative Submission at 4/14/96, Sgt. Caruso to Capt. Grill

Disciplinary Record Card, Montalvo
**Complaint Against Personnel at 3/22/96**, Caruso against Montalvo
**Investigation of Personnel, 3/22/96**
Administrative Submission at 3/24/96, Sgt. McMillan
All Police Broadcast, hat recovered, 3/24/96
Incident Report for Montalvo, 3/22/96
Administrative Submission, 3/22/96, Sgt. Meehan to Capt. Grill
**Failure to Approve Training – Request for Transfer – Investigations Ignored:**
**Administrative Submission, 10/1/96**, Montalvo to Capt. Lucas
**Requests for Investigation and Transfer:**
Administrative Submission, 2/24/97, Captain Lucas to Deputy Chief
**Request for Assignment, 2/24/97**, Montalvo
Administrative Submission, 2/18/97, Montalvo to Capt. Lucas
Sick or Injured Leave Record at '97, Montalvo
Daily Activity Report
Disciplinary Record Card, Montalvo
Driver History, 11/26/96, Montalvo
**Command Citation, 1/15/97, Montalvo**
**Command Citation, 2/7/97, Montalvo**
**Command Citation, 1/2/97, Montalvo**
**Administrative Submission, 9/26/94** – life threatening situation – Sgt. Wilke to Captain Grill
Incident Report, 9/15/94
**Command Citation, 1/26/94**
**Command Citation, 8/23/94**
**Commendation from Director of Police Santiago to Montalvo, 9/22/97**
**Administrative Submission, 9/22/97, Request for Permanent Reassignment – Reassignment**
Occurred 9/4/97
**Lt. Ronald Kinder brings charges against Montalvo for insubordination and false statement.**
**IOP #00-96, CAP #00-217:**
**(Kinder sought Montalvo to lie and accuse another Officer of causing an assault on an arrestee.**
**– The incident did not occur.)**
**Administrative Submission, 2/1/00, Montalvo to Capt. Golden**, observations IOP #99-2107
**Administrative Submission, 2/2/00, Lt. Santos to Capt. Golden**
**Officer History P.O. Montalvo printed 7/15/05**
**Lieutenant George Alberto acted as the primary investigator. – Problems existed with Lt.**
**Alberto since 3/96 when Plaintiff complained that he was interfering with a lawful arrest.**
**Shooting Investigation IOP #00-081, CAP# 00-406**
One month suspension issued for prior incident at 3/6/96 (retroactive punishment despite being
cleared by all government agencies. **Montalvo was cleared by a Grand Jury by October of 2000.**
**Montalvo out on stress leave.**
Administrative Submission, at 5/30/00, Kurt Ebler to Acting Deputy Chief, recommendation for
temporary transfer and reassignment of Montalvo to Medical Services since Montalvo booked off
with stress on 5/5/00.
Order/Addendum to Personnel Order 99-235 at 6/12/00
**Lt. Gagliano originates false allegations at 10/01against both Plaintiffs for having sex on a**
**COMSTAT table.  Capt. Ebler interferes for reprisal and determines Montalvo should be**
**transferred out of his command.**
**Harassment – Separate Incidents – Capt. Ebler acting hostile and retaliatory:**
**Administrative Submission 10/16/01**, Montalvo to Capt. Ebler
**Administrative Submission, 10/23/01**, Montalvo to Capt. Ebler
Administrative Submission, 11/26/01, Ebler to Malanga

Administrative Submission, 11/23/01, Sgt. Pereira to Capt. Ebler
Complaint against Personnel, 11/20/01
Investigation of Personnel Report, 11/23/01
**Administrative Submission, 11/20/01**, Montalvo to Ebler
Communications Division Dispatch Record
Duty Roster – Communications Division
Investigation of Personnel Report, 10/16/01
Complaint against Personnel, 10/15/01
Administrative Submission, 11/9/01, Sgt. Pereira to Montalvo, Internal Investigation IOP 01-1531
Rules of Discipline from Chapter 6, Chapter 2, Investigation Disposition
Director's Memorandum at 7/26/99 – General Memorandum 99-638, disciplinary charges and specification requirements
Disciplinary Record, P.O. Jose Montalvo
Administrative Submission, 11/20/01, Pereira to Montalvo
Administrative Submission, 11/23/01, Pereira to Montalvo
Investigation of Personnel, 11/26/01, Capt. Ebler submission to Deputy Director Rocco Malanga (complaints, investigations and radio discipline), IOP#01-1531, CAP#01-514.
Administrative Submission, 11/30/01, Capt. Ebler to Dep. Director Malanga, IOP#01-1657, CAP#01-528
**Investigation of incidents at 49 Halleck Street for 12/31/01. Montalvo complains of incidents at his home with his then wife, Lillian Mejias, that impact his performance. Lillian Mejias was sexually pursuing an affair with Samuel DeMaio.**
Investigation Report for 12/31/01 and incident complaints for that date, along with tapes and interviews must be produced with continuing discovery. These are critical proofs for time of trial, including tapes held by the IAD for interviews pertaining to Samuel DeMaio, Angel Gonzalez, Lillian Mejias and Jose Montalvo.
**Capt, Richard Cuccolo received Montalvo's written complaints.**
**After the 12/31/01 incident, Montalvo transferred to the Cell Block again.**
Personnel Order No. 02-002, 1/2/02, Permanent Transfer and Reassignment
**Administrative Submission, 2/18/02**, Montalvo to Capt. Henry Gajda – No access into the system.
Administrative Submission, 4/12/02, Capt. Gagda Jr. to Dep. Chief
Administrative Submission, 4/12/02, Capt. Gagda Jr. to Dep. Chief, folder back to the PPD on 4/29/02
**Administrative Submission, 10/14/02**, Montalvo to Capt. Campose – Uniform allowance seized by P.O. Lillian Mejias (Montalvo).
**Lt. Kinder was assigned to PPD and kept harassing Montalvo**
**Administrative submission, 2/7/03**, Montalvo to Capt. Campos – no change
**Administrative Submission, 6/4/03**, Jack McEntee, F.O.P. to Capt. Reilly, safety issues
**Administrative Submission, 6/2/03**, Montalvo to Capt. Reilly
**Administrative Submission, 6/23/03**, Jack McEntee, F.O. P., to Capt. Reilly – grievance for improper counseling, Montalvo
**Threats and Incidents Regarding P.O. Ferrer, IOP 03-766, CAP 03-766**
Administrative Submission, 7/17/03, Montalvo to Sgt. Wnek
Notice of Disciplinary Action, 8/18/03, CAP 03-207
**Montalvo trying to recover his gun**
**See Complaint filed under Docket No. L-8004-03, <u>Montalvo v. Newark Police Department</u>**
**False Statement Investigation and Other Investigations**
See facsimile transmittal Montalvo to F.O.P. at 7/19/05
General Order 93-2, Trial Boards or Disciplinary Conference must be set no less than 5 days and no more than 30 days after the employee receives preliminary notice of disciplinary action.
**Preliminary notice of charges, 6/29/05**

**Complaint against Personnel at 6/3/05**
Investigative Submission, 6/28/05
Complaint against Personnel at 6/3/05 – Sgt. Silver
IAD Investigation Memorandum 2005-332
**Investigation of Personnel, IOP 05-687**
**Administrative Submission, 6/3/05,** Montalvo to Capt. Ciccalese
**Preliminary Notice of Disciplinary Action**, 7/28/05
**Final Notice of Disciplinary Action**, 7/29/05, served 8/3/05
Uniform Violation for spilling beverage on shirt at Cell Block
Administrative Submission, 10/4/05, Lt. Rodriguez to Montalvo
**Administrative Submission, 10/10/05** Montalvo to Lt. Rodriguez
Log at 9/23/05
Administrative Submission, 11/3/05, Rodriguez to Montalvo
Pre-interview Advisement Form, IOP 04-1269
**Investigation of Personnel**, 10/17/05
**Administrative Submission, 10/16/05,** Montalvo to Acting Capt. Estevez
**Administrative Submission, 11/22/05** Montalvo to Acting Capt. Estevez
**Administrative Submission, 3/31/06,** Montalvo to Capt. Coley, unexplained denial of training
**Administrative Submission, 4/28/06,** Montalvo to Capt. Coley, request for shift change or transfer
**Administrative Submission, 6/6/06,** Montalvo to Capt. Wilson
**Administrative Submission, 8/22/06,** Montalvo to Capt. Venable, request for transfer
**Administrative Submission, 8/22/06,** Montalvo to Capt. Venable, return of my personal property –
4th request from property room (clothing, baton, badge holder, gold chain and pendant valued
$1,600). Part of shooting investigation at 1/2000 where Montalvo was cleared.
**Administrative Submission, 8/23/06,** Montalvo to Capt. Venable, request for training, use of the
mobile data command

### 2.     The Defense Summary Of Plaintiff's Claim Purposely Omits All The Meaningful DPI-1001's, Grievances, Affirmative Action, Notice of Claim Or Discovery Responses, Or Depositions.

Before this time, Plaintiff has electronically filed Motions, oppositions and replies with

voluminous supporting exhibits at 2008.   At least four full cartons of material evidence with

Affidavits and Brief Memorandum were produced to prior Chambers for 2008.   Further, Plaintiff's

Counsel filed Motions, respectively, for both Plaintiffs, on the Amended Complaint and Retaliation

Complaint then pending at 2009.  Settlement for a single Plaintiff occurred, leaving litigation only

for Jose Montalvo.  With due respect, the large voluminous filings have not been popular, although

great effort went into each Motion to pull favorable testimony and cite the admissions from each

City employee being deposed.  It is also noteworthy that Jose's long testimony of two days is barely

shown at the Defense Brief or Rule 56.1 Statement of the Defendants, nor are the steady candid

admissions of former Director Anthony Ambrose, Director Garry McCarthy, Deputy Chief Niles

Wilson, Deputy Director Anthony Campos, Deputy Director Keith Isaac, Deputy Chief Samuel

DeMaio, Captain Kurt Ebler, Captain Sheila Coley, Lieutenant Vincent Gagliano, Lieutenant

Robert Kowalski, Jose's former boss Lieutenant James Walsh, Sergeant Dennis Sanders, Sergeant

Jose Alvarez, Detective Lillian Mejias.[7]   The aforesaid Lieutenant James Walsh retired, but

appeared after service of a subpoena for two days of deposition testimony to unravel exactly why he

concluded Jose Montalvo was so targeted, that is, as a discriminatory victim of the NPD for so long,

and he (the boss) could not possibly resolve the adverse employment action, knowing there was

tacit approval of the NPD Command operations and activities impacting Jose, as an Officer of color,

on a 'hit list' to be damaged.   Lieutenant James Walsh's testimony was previously set forth at the

9/22/10 Brief, pp.35-38.

### 3.      Plaintiff's Amended Complaint, Count I

The standard for hostile work environment under the existing caselaw states even one

incident of harassing conduct can create a hostile work environment, if severe enough.   Taylor v.

Metzger, 152 N.J. at 499.  For Jose Montalvo, it began early, with the known false accusation "sex

on the COMSTAT table" and did not end until he was terminated at 2006; see Plaintiff's present

Affidavit in Opposition.

In Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367 (1993), the Court

reaffirmed the proposition that the abusive hostile work environment harassment requires an

objectively hostile or abusive environment - that a reasonable person would find hostile or abusive -

as well as the victim's subjective perception that the environment is abusive.   Moreover, the Court

---

[7] As relevant to the Amended Complaint, some of the long testimony was recited in the 9/22/10 Brief Memorandum,
Plaintiff's new Motion for Summary Judgment.  The goal is not to overwhelm the Court, again, but to add more recent
testimony or pick up more testimonial proofs rather than repeat all the same evidence.  Some testimony is saved for Trial
or the Reply, if appropriate.

held that the workplace must be permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe, or pervasive to alter conditions of the victim's employment and create an abusive working environment. Id. at 21.  Here, the Plaintiff will establish the existence of a hostile or abusive work environment by the totality of the circumstance.  Aman v. Cort Furniture Rental Corp., 85 F. 3d 1074, 1081 (3d Cir. 1996).  Numerous incidents are described at Plaintiff's Affidavit in Opp.  The New Jersey IAD follows the same mandate and requires the same basic test for Plaintiff to prove a discrimination claim:  the complained of conduct (1) would not have occurred but for the employee's perceived race (Hispanic) and national origin and it was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment were altered and the working environment was hostile or abusive and (5) existence of *respondeat superior* liability.  Taylor v. Metzger, 152 N.J. 490, 498 (1998) citing Lehmann v. Toys R Us, Inc., 132 N.J. 587 (1993).  West v. Philadelphia Electric Co., 45 F. 3d 744, 753 (3d Cir. 1995).

## POINT II

## PLAINTIFF'S HOSTILE WORK ENVIRONMENT HAS REAL MEANING AND CAN SURVIVE BURDEN SHIFTING ANALYSIS.

### A.     The Defense Rule 56.1 Statement Offers Marginal 'Proofs," Pretext With Excuses, and Then A Ready-Made Conclusion.

### 1.     False Accusations And Rumors Spread to Jose's Precincts; Years of Mockery and Ridicule, Which Were Never Lived Down.

There was no basis for the sex scandal investigation, IOP 01-1589 where Plaintiffs were falsely accused of sex on the COMSTAT table.  There was never a witness that came forward nor videotape or audio proofs of anything to do with sexual activity within the COMSTAT room.  (The COMSTAT room has constant video surveillance monitoring.)  The bizarre finding was that the IAD had a proper investigation, without a complainant or video proofs.  (Plaintiff's spouse, Rene

14

Neves, could not be a complainant.  (He did not work for the NPD and only picked up on the lies

spread within the Precinct through his brother.)  It was well known that Captain Vincent Gagliano

had started the false rumor, since he was in charge, but he was not even interviewed when the

Internal Affairs Division investigation occurred.  Gagliano T.47:22 to T.49:5.  Certainly, Vincent

Gagliano contributed to the sexual scandal discussed in the NPD Precincts pursuant to his own

testimony shown at Gagliano T.44:5 to T.47:16, as follows:

```
 5      Q.    Do you know how Yessennia and Jose came
 6   to be accused of any impropriety at the com stat
 7   building involving sexual activity?
 8      A.    I only can tell you what I seen and what
 9   I didn't.
10      Q.    What did you see, sir?
11      A.    I don't know what date in question it
12   was but I know it was four o'clock in the morning.  I
13   was sitting upstairs in the supervisor position, you
14   know, area, if I may.  I received a phone call from
15   this fire supervisor.
16      Q.    Who was the fire supervisor?
17      A.    Annie Campbell.  Her exact words were to
18   me, captain, this is not right what's going on,
19   especially during your shift.  You're a good person.
20   This shouldn't happen.  You don't need no problems.
21           I said, what are you talking about?
22   Come down here.
23   To where?
24   To the lunch room.
25           I think there was a sergeant,
 1   lieutenant, I don't know who was working with me.  I
 2   got on there and said, I have to go downstairs.
 3   Something's going on.
 4           I get on the elevator and go downstairs
 5   and go into the lunch room and there is Annie.  There
 6   is nobody around.  I'm looking around.  She is
 7   pointing inside the com stat room.  With this, as I'm
 8   approaching the com stat room, the doors come flying
 9   open, Rodas comes running out, running to my right,
10   corner of my eye.  I look in her direction and see
11   him coming out fixing his pants, if I may.  I chased
12   her.
13      Q.    Can you do me a favor?
14      A.    Yes.
15      Q.    People have emotions.  Her face isn't
16   that far away.  Don't point.  I don't want to have
17   any problems.
18      A.    I went after Rodas and asked her what is
19   she doing at four o'clock in the morning.
20      Q.    He was fixing his pants?
```

15

21    A.   I paid no mind to him.  He went to
22 the -- coming out would be -- it would be to -- she
23 went to the right and he went to the left.  Both ways
24 you go upstairs to CC.  She was out the door already
25 on the side of the building.  Her vehicle was there.
1 She was getting in her vehicle.
2        Oh, nothing, boss, nothing is wrong.  I
3 have to get something out of my locker.
4        I said, Rodas, I'm being called.
5 Something is going on.
6        Nothing.  Nothing.
7        Meanwhile, she is starting up the car
8 and she is gone.  I came back in and went upstairs.
9        I never said anything to Officer
10 Montalvo.  Nothing.  I didn't see nothing.  It wasn't
11 an issue.  I didn't spread no rumors.  Never even
12 wrote a captain's report, as we call them.  Never
13 wrote a report.  Never once was asked by Internal
14 Affairs or anyone what I had seen or did I say
15 anything or what happened.  Don't even know an
16 investigation was started.
17        After maybe months later I hear through
18 the grapevine there is some type of investigation
19 because I believe Annie Campbell either got into an
20 argument or words with either Jose or Rodas.  I don't
21 know.  But it never came from Vinnie Gagliano.
22 Never.
23    Q.   I need to ask you something.
24        Did you ever have another conversation
25 with Annie Campbell as to what she saw?
1    A.   Yes.  When I came back in I said Annie,
2 what happened?
3        All she said to me was, Captain, they
4 were in that room for a while.
5    Q.   What does that mean, though?  They could
6 have been talking.
7    A.   Well, that's why I made no issue of it.
8 Never approached her the next day.  I seen Rodas.
9 Because she worked up in CC.  Never even approached
10 him and asking him what he was doing in the com stat
11 room.  Technically speaking, no one is allowed in
12 there after hours.  No one.  No one.
13    Q.   What factual basis do you have to
14 believe that there was any sexual activity in the com
15 stat room?
16    A.   I said I didn't.

After a prolonged IOP, the accusations were unfounded.  Captain Kurt Ebler from CCU

gave his version based on what Gagliano reported.  No witnesses (including Annie Campbell) came

forward; see paras. 7-16, Plaintiff's Aff. in Opp.  It was plain from his testimony, Gagliano really

believed they had sex and he discussed it sufficient for all the Precincts to know the identity of the

'guilty' Officers involved. This false allegation permanently harmed Jose Montalvo. No facts of exoneration nor confidentiality existed for the victim(s). Instead, there was more adverse employment action; see Transfer, Cell Block Re-assignment, **Exhibit J**.

Yessenia Montalvo had barely been married for 11 months. Her new husband was so angry that he became abusive. Their marriage was quickly over in a divorce along with that of Jose Montalvo. The opposition Affidavit depicts the greater adverse employment action. Jose was targeted and placed on a "hit list" where he was repeatedly subjected to harsh interrogation at the IAD unit predominated by an atmosphere of intimidation, ridicule and insult.[8] Jose's reputation, as an honest Police Officer, became seriously altered. Singer v. Beach Trading Co., Inc, 379 N.J. Super. 63, 80 (App. Div. 2005); DeAngelis v. Hill, 180 N.J. 1, 14 (2004) from the time of this sexual scandal. Stigmatized comments became publicized to taunt him until he was finally terminated at 2006; see Affidavits filed at 9/22/10.

### 2.      Montalvo Was Challenged By Ongoing False Incident Reports,   IOP's, CAP's For A Discriminatory Retaliation Claim, N.J.S.A. 5:10-12(d).

Notwithstanding long years of litigation and discovery, the Defense offers his interpretation of what remains in the case, hence, avoiding all the false incident reports, or IAD investigations against Jose Montalvo. Mr. Pennington would have this Court blindsided to a single allegation that: As a result of Gagliano's false allegations pertaining to him, Jose was subject to a litany of trumped up charges" …"including the misuse of his duty weapon for which he was de-gunned." In furtherance, Defense Counsel pretends the charges were [**timely**] sustained and Plaintiff was given a 20 day suspension… Firstly, the situation of 20 day suspension was totally stale punishment by five (5) years. All the Rules and Regulations, including a 45 day Rule Mandate were ignored… just to pad a discipline record of minor administrative offenses up to the time of termination, but the

---

[8] Jose's IAD investigations were listed for this Court at pp. 12-14 of this Brief. When he complained, he could not obtain any investigation, but the IOP's against him were numerous.

argument belies the facts of trumped up, false, perjured statements being made by the NPD Supervisory workforce, against Montalvo during the years, **IOP 00-081, CAP 00-406; IOP 00-96, CAP 00-217; IOP's at 2001 along with false Administrative Submissions 2001, Personnel Order being re-issued for Permanent Transfer and Reassignment to the Cell Block (again); IOP's and false Administrative Submissions during 2002 for incident of 12/31/01 and, then, for 2003 when Lieutenant Kinder became assigned to the PPD, new false administrative reports by Supervisors.    Additionally, there was IOP 03-766, CAP 03-766 for incidents involving Officer Ferrer.    Also, the Court will readily see all the 2005 written (false) Administrative Submissions pertaining to a CAP at 6/3/05 or 2005-332, IOP 05-687, or IOP 04-1269.**[9] The foregoing is easily tracked at Plaintiff's Answers to Interrogatories or the list carried over to this Brief Memorandum, pp. 13 to 15.  More importantly, Plaintiff's Aff. in Opp. provides lucid facts of constant discriminatory harassment and, Jose was explicit that he became challenged for filing complaints, as an Hispanic Police Officer, filing in good faith, but never obtaining recognition of his rights to work in peace without discrimination.  Plaintiff's Aff. in Opp., paras. 93 to 96, indicates he had filed an Affirmative Action Complaint at 4/22/05 (Exhibit JJ) stating facts of discrimination and that he was being treated in this manner because he was Hispanic.  Also, his Notice of Claim filed before the lawsuit set forth facts of discrimination; see Carmona v. Resorts International Hotel, 189 N.J. 354, 915 A.2d 518, decided February 21, 2007.  He had protected activity from the very first time he presented an Affirmative Action Complaint, at a minimum, stating the discrimination, but see also the Notice of Claim and ongoing submissions.

> **3.    Jose Montalvo Is The Singular Police Officer To Work So Long Without A Weapon, In The NPD.**

---

[9] It is most curious that the thrust of the Defense argument is that they cannot have Officers in their midst who perjure "statements" or "make false statements" but that is exactly what the Supervisors did to Jose Montalvo; see bold false statements, above.

### A.  Cell Block And Disarming.

Police Officers are routinely recognized on the public streets of the City of Newark after so many years of service.  Jose Montalvo was de-gunned from 2000 to the end of 2005, and for all that time, he was treated different than any other NPD Officer: (i) he was stripped of both his duty weapon and personal weapon; (ii) he did not obtain his ID card or gun permit for his weapons; (iii) he remained totally vulnerable (de-gunned) to criminals out on the street while transporting himself to work, or to personal events, or for his family; (iv) he could not obtain any IOP investigation or statement from the Command why his duty weapon was not being re-issued per the Employer's standards, R/R/, when another Agency takes it, and, also (v) he could not get explanation for permanent status to the Cell Block, although permanent assignments literally do not exist; see Walsh testimony, pp. 35-38 at 9/22/10 Brief and below testimony.

### 4.  Union Representative Walter Melvin's Testimony Confirmed Jose's Hostile Work Environment Claim.

F.O.P., Lodge 12, Union Representative Walter Melvin confirmed NPD procedures for major and minor discipline infractions; Melvin T.29:8-22.  *Jose was targeted, and on a hit list, to be assigned permanently to the Cell Block.*  Melvin T.33:17-21.  The Detective explained how Officers are treated after a shooting, *if a gun is taken… You're furnished with a subsequent duty wea*pon.  Melvin T.34:4 to T.35:6.  *Jose had years not being armed, and he put on paper that he wanted to be re-armed, and his thoughts on why he was not armed.*  Melvin T.35:7 to T.38:4.  *Jose was in the Cell Block the longest of any employee, … and without a gun.*  Melvin T.36:18 to T.39:5.  *Absent being convicted of a crime or a Court Order, as in a Restraining Order, the NPD cannot keep a duty weapon so as to prevent an Officer from working.*  Melvin T.38:8 to T.39:19…  He stated "*the Collective Bargaining Agreement does not talk about arbitrary, capricious action or the discipline action, but the Union has fought it in the past, only to be told it is "Management Prerogative*," but

then he adds…"*there was no justifiable reason to deny Jose Montalvo his weapon, or hold him on permanent assignment at the Cell Block…*"   Melvin T.40:4 to T.42:2.   He expressed an opinion based on Jose's discipline… that ... *he could have had a 'fairer' outcome under progressive discipline for a 30 day suspension.*   Melvin T.58:8 to T.60:24, but, also stating, *the IAD should not have obtained any information from the Grand Jury Subpoenas;* see Melvin T.60:16-24.

<h3 align="center">Discriminatory Hostile Work Environment - Ongoing Retaliation</h3>

According to Melvin, the fact *Jose was Hispanic gave him less opportunity to be treated fairly*.  Melvin T.61:5 to T.65:14.  *Caucasian Officers in the Supervisory Command will not get the same discipline.*   Melvin T.65:15 to T.66:24, and he explained the breakdown of Supervisory Management does not show diversity with the greater percentage of Supervisors in Upper Management being Caucasian, not minorities.  His statistics were explained verifying the ACLU conclusions that 50 Officers within the NPD were terminated for excessive discipline to minorities; see Exhibit A, ACLU document to Plaintiff's Counsel's Cert. in Opp.

This Union Representative knew *Yessenia and Jose had the same charges for termination.* Melvin T.72:20 to T.75:21, and *Jose should have been reinstated with a promotion*, Melvin T.72:23 to T.73:13; but then he clarified *Jose did not have a snowball's chance in hell of being transferred anywhere favorable, even if he were to be reinstated.*   Melvin T.140:5 to T.142:13.   He believes *Jose is looked at as a minority, who is too outspoken.  It may have begun with the rumored events between him, DeMaio and his ex-wife, but…it has expounded to the point where [Jose] doesn't know his place, and he will be shown…*"Anyone who would okay something for Jose, will not do it because they would become a target of retaliation…"

Melvin blamed the discrimination in the Command structure itself…how the Deputy Chief Samuel DeMaio had the power and authority….*"He was behind all of Montalvo's problems."*

20

Melvin T.140:22 to T.141:25. He knew *Jose's issues and problems to attain gainful employment elsewhere were impacted by the former Employer's sending out information, which is not to go out to other Employers*. Melvin T.142:14 to To.143:19. "*They expounded extremely on the NewarkSpeaks situation, and, it was given out to Homeland Security to tell them he is a troublemaker*." Melvin T.143:20 to T.145:1. Melvin indicated *Jose was a good Police Officer, but he stands up against corruption*. Melvin T.160:8 to T.164:23, see, particularly T.162:13-20.

Walter Melvin did not equivocate when answering deposition questions also from the Defense Counselor, Mr. Pennington. *The Cell Block is an undesirable appointment*. Melvin T.223:6 to T.226:6. And, *Jose could have other assignments without a gun, at Communications, any of the Precincts to work behind a desk or to work in back offices at any Precinct, or at a Detective Bureau, as another assignment or clerk*. Melvin T.224:1-14. *Just because he had an open investigation had no bearing on whether he should be at the Cell Block*. Melvin T.226:14-25. *Jose was permanently de-gunned…for 5 years*. Melvin T.227:18 to T.228:24. *By statute, our job…requires a Police Officer to have a gun* [Melvin conceding to Pennington]. *The Department would not give us [the Union] any reason Montalvo was de-funned*. Melvin T.230:6-22 *Had it been justifiable, I believe we would have been given a reason…*

This deponent identified a list of Hispanic Officers who were targeted, and on a hit list, within the Employer's workplace, and he began with Jose Montalvo. Melvin would not back down and kept giving facts. The Union Advocate expressed the truth of many Officers' giving "False Statements," and how it is actually handled by the Employer, routinely: "*Even if you don't tell the truth or misstate, unless that scope is something far outside of normal issues, then that should be handled as minor discipline…You can be charged under minor discipline. A punishment can be up to five days suspension*." Melvin T.365:19 to T.366.23. Romano v. Brown, 284, N.J. Super. at 549.

When shown, the Union's "Concise Work History" discipline for Jose Montalvo, Melvin explains the last suspension for Jose was in '**01**, 5 days without pay.  <u>Progressive</u> <u>discipline</u> <u>policy</u>, <u>and</u> <u>his</u> <u>charges</u> <u>for</u> <u>termination</u>, <u>which</u> <u>were</u> <u>administrative</u>,... is far outside the scope of the NPD policy, concluding Jose's termination should not have occurred.   Melvin T.388:10-25.   [Jose's] Departmental Trial was only in regards to administrative issues.  Melvin T.384:22 to T.385:5.[10]

## POINT III

### BREACH OF CONTRACT, COUNT II.

A.   **Certainly, Plaintiff Believes He Is Protected By A Valid Enforceable Collective Bargaining Agreement Embracing All The Written Policy (General Orders, Memorandum, Rules and Regulations Tied Into It.**

The Collective Bargaining Agreements[11] between the City of Newark and the F.O.P. Lodge 12 and S.O.A. have always referenced enforcement of reasonable and just Rules and Regulations in connection with the NPD operations and for fair maintenance of discipline.  The Agreement at January 1, 2005 through December 31, 2008, which impacts the Plaintiff, was certainly produced to Defense Counsel during discovery, and additional policies, General Orders and Director's Memorandum were furnished despite the volume or costs of discovery production, as easily shown at Plaintiff's Cert. in Opp.   Good faith and fair dealing provisions are inherently built into the same Contract.[12]  The argument is not whether it is a strict Contract or implied Contract, <u>Woolley v. Hoffmann-LaRoche, Inc.</u>, 99 N.J. 284, mod., 101 N.J. 10 (1985).   The City follows Attorney General Guidelines and extends to all its employees a Collective Bargaining Agreement with stated representations for enforcement of all Policies, Protocol, Director's Memorandum, General Orders

---

[10] This is just the tip of the iceberg for the discrimination/retaliation affirmative testimony from Melvin.
[11] The Defense Brief skips over Count II, and then returns to it.  Plaintiff's Brief will take the causes of action in order.
[12] Certainly, Plaintiffs believe they are protected by Contract, that is, a valid enforceable Collective Bargaining Agreement and all the written policy, protocol, Rules and Regulations tied into it.

and the Rules and Regulations. Employees have inherent rights thereunder. Basic Contract principles apply.

Moreover, the City has agreed to confer and to protect its Police Officers. No employee at any (Supervisory) level has permission to act in a reckless or wanton manner outside the scope of his/her employment, or to cause claims against employees, which amount to punitive damages. **Article 23** secures officers' rights with Rules and Regulations enforceable at all ranks to the highest Commander appointed by the City. <u>**Article 27** states specifically there shall be no discrimination, interference or coercion by the City or by any of its agents against the F.O.P. or against the employees thereof.</u> **Article 28** ensures proper investigations, including General Order 68-3. More importantly, there is an **Article 30 pertaining to discipline and discharge, but it only references discharge or discipline for <u>good and just cause</u>. The 45 Day Rule is expressly articulated in Article 30 pertaining to a punishment limitation**. Jose's suspension for his 2000 shooting for loss of a 20 day pay period was prohibited at the year 2005. There were other provisions applicable to the instant case for time of trial, which were shown at the Notice of Claim and, lastly, at the Supplement to Interrogatories, at March 22, 2007.

1.    **Article 23, Rules and Regulations And Other Relevant Portions Protecting Officers.**

The list of applicable Articles, which were violated for Jose, were specifically enumerated for Defense Counsel: **Article I**, Sect. 1, "Recognition;" **Article 14**, "Sick and Injured Leave;" **Article 21**, "Maintenance of Standards;" **Article 22**, **Sects. 1 and 2**, "Management of Rights;" **Article 23**, "Rules and Regulations;" **Article 25**, "Extra Contract Agreements;" **Article 28**, "Investigations;" **Article 29**, **Sects. 2 and 4**, "FOP Privileges and Responsibilities;" **Article 30**, **Sects. 1 and 2**, "Discipline and Discharge;" **Article 34**, "Fully Bargained Provisions;" and **Article 35**, "Duration." Additionally, there was reference to the **Arbitration Agreement** - sick leave and

23

other provisions, and the **Violation of the 45 Day Rule**, specifically see the Discovery Supplement to Attorney Pennington at 3/22/07 as proof that same were addressed with clarity to the Defense.[13]

All the important written Policies, Director's Memorandum and General Orders, which were incorporated by reference, and enforceable against the NPD Supervisory workforce, were supplemented under separate correspondence of March 20, 2007 and directed to Attorney Pennington, as well.   Jose Montalvo was always prepared to testify to these provisions, but deposition inquiry did not focus on this subject.

**B.      While Jose Was Still Employed, He Could Not Obtain Investigation Of His Own Complaints, Submissions of DPI-1001's.**

**1.      Defendants Kept Violating The Director's General Order 05-04 Establishing Plaintiff's Rights, And, The IAD/Professional Standards And Procedures Required To Be Followed Under The New Jersey Attorney General Guidelines.**

It makes logical sense that Jose and Yessenia Montalvo separately sought proper investigations by the Internal Affairs Division into the adverse impact of Jose's ex-spouse, Lillian (Mejias) having a sexual affair with the Deputy Chief, Samuel DeMaio, and the adverse employment actions which occurred for each of them as a resultant effect of Samuel DeMaio aggressively acting to 'protect' his paramour.  This Detective, Lillian Mejias, was widely known to be sexually involved with the Deputy Chief for the last eight years and, in that whole time period, Jose Montalvo was not the target of any domestic violence complaint or any criminal prosecution, however, his service weapon and personal gun were taken and withheld, as if he had been charged, criminally.   Unlike any other Police Officer (including known wrongdoers) Jose received a permanent assignment to the Cell Block, but no overtime work.  Even his police badge had been withheld and typical gun registration permits were not processed, without explanation.

---

[13] Also, the Notice of Claim (Exhibit LL) was sent with details of these Contract violations.

As the Supervisory Officer, James Walsh testified he tried to pursue answers, without any positive result, except a tacit understanding that the Chain of Command verbally put Jose Montalvo on their "hit list" to prevent:  (i) his obtaining another NPD service weapon or personal weapon; (ii) reclaiming of his lost property (jewelry) from a shooting investigation; (iii) transfers out of the Cell Block; (iv) any more training; or (v) advancement within the Department.  The aberrant goal was to establish a lasting termination program and he would not join in, himself; see Exhibits G and H to Plaintiffs' Counsel's Certification comprising past relevant testimony of Lieutenant Walsh, also detailed at the 9/22/10 with relevant excerpts.

A single document governs *the broad range of all Internal Affairs Division ("IAD") activities*, that is, General Order 05-04 (Exhibit DD).  This broad policy endeavors to set up all Plaintiffs'/Officers' rights and procedures to prevent self-incrimination, search and seizure, or other constitutional violations.  It is a highly descriptive 27 page document defining the entire operations of the IAD, and for concerns of interviewing any Officer, who is the subject of a criminal investigation, there must be Miranda rights given, and a right to counsel exists.  Further, the Prosecutor must be immediately notified when a duty weapon is confiscated.  Also, there is mandatory protocol to prevent false Administrative charges or criminal charges, with preliminary IAD reporting by Supervisory Officers, with proper training and supervision during their investigations.  Plaintiff's expert, Lieutenant Samuel Clark, has analyzed the purposeful systemic corruption, which impacted Jose Montalvo at Exhibit C, made part of Plaintiff's Aff. in Opp.

Concisely put, the City of Newark has established the IAD Unit, and sub-Unit, Professional Standards, to operate and report only to the Director of Police.  There is no monitor or "control" to prevent harsher sanctions for Administrative violations or more excessive discipline to minorities; see Safir Rosetti Report findings that Hispanic and African American Police Officers obtained

excessive discipline compared to white counterparts, and the City deliberately did not have any comprehensive anti-corruption strategy; Exhibit C to Plaintiff's Counsel's Cert. in Opp.

## POINT IV

## PLAINTIFF'S CONSTITUTIONAL AND OTHER CIVIL RIGHTS WERE VIOLATED TO PURSUE HIS TERMINATION - NO TITLE VII CLAIM ASSERTED.

### A.     Third Count of Complaint Clarified.

This case arises out of a long series of Supervisory abusive police efforts to bully, intimidate and silence Jose Montalvo.  In cumulative effect, Plaintiff became punished for articulating all his complaints within the NPD, internally and outside.  Then, he was wrongfully terminated as a resultant effect.  Plaintiff resorted to exercise his constitutional entitlement to discuss, opine and report on the corruption within his workplace, as did numerous other Officers within the ranks.  The within argument was previously made at Plaintiffs' Motion for Partial Summary Judgment.

### B.     First Amendment Claims.

This Plaintiff became wrongfully terminated for exercising speech over the internet, pursuant to his First Amendment rights, and, he acted no different than other Officers.  Incredibly, there was never a Court Order requiring Comcast Corporation, Cablevision Systems Corporation (Optimum Online), Webmaster NewarkSpeaks.com Moses Wilson, or the Planet to identify the source of any information which would involve Jose Montalvo or others to be revealed.  Through this litigation, it was discovered exactly how, and what, Supervisory Officers received pertaining to Plaintiffs, including private information divulging the full identity behind their privileged, anonymous screen names, home addresses and identification of their home computer set-up, social security numbers and banking and credit card criteria for establishing all their private account indicia for the aforementioned vendors; see the various Grand Jury Subpoenas at Plaintiff's Aff. in

26

Opp. (Exhibit S)  For the time of these illegal, unconstitutional disclosures, two separate Superior Court Judges heard the plan of an Assistant Essex County Prosecutor, who was accompanied by City of Newark Sergeant Dennis Sanders and Lieutenant Robert Kowalski, but each refused to sign any Judicial Order.  No special Grand Jury was impaneled nor a search warrant or communication information warrant signed.  No motion to quash subpoena occurred.  Plaintiffs' prior Statement at 9/22/10 sets forth the facts behind the constitutional violations.

## C.    There Was No Intent To Conduct Pre-Service Depositions Of The Owner Of Any Internet Blog At, Before, Or After March 30, 2005.

For decades, the Plaintiff's Employer had an Internal Affairs Division, which was not an independent department or agency of the City of Newark Administration or the Police Department. As aforementioned, the IAD was purposely set up to only report to the Director of Police. Moreover, the IAD was totally captive to the Director of Police's expressed goals and direct orders. For the case at bar, it was Anthony Ambrose who served as Director at 2005, and he tasked the IAD Deputy Chief/Captain Kurt Ebler and Supervisory workforce (Lieutenants Kowalski and Leroux, along with Sergeant Sanders, amongst others) to monitor information posted on the Newark Speaks website, as proven by his own memo to Kurt Ebler on March 20, 2006.  By March 24, 2006, Lieutenant Victor Cuccolo of the IAD was involved and had pursued a highly irregular probe and reported to the subordinate IAD workforce that he 'discovered' Newarkspeaks.com had an address at 1 Gateway Center, Newark, New Jersey 07102.  Lieutenants, Robert Kowalski and Michael Leroux 'muscled' their way in, by abusing their authority, to determine the Company location, telephone and specific facts of operation of renting mailboxes and office space, and to fully identify the General Manager, Rita Patel, and the owner of NewarkSpeaks.com as Moses Wilson, Jr. (Owner or Manager).  The IAD Units intimidated and threatened the owner, Moses Wilson.  The

27

identified subjects were never pursued with any notice for deposition or advanced an Order from the Court nor was any other subject of the Grand Jury subpoenas.

### D. No Serious Criminal Complaint Was Filed Or Contemplated.

From all the long deposition testimony taken in this litigation, the Chain of Command unabashedly reveals it had mixed emotions regarding the postings by the Newark Police Officers and other citizenry. The Deputy Chief, Samuel DeMaio, indicated he was personally bothered; Captain Victor Cuccolo was upset and disturbed; but the Director, Anthony Ambrose, disguised his sentiments and he only admitted to being amused at the website. Certainly, the Director had actually participated to instruct the Deputy Chief Ebler and Lieutenant Cuccolo to begin the IAD investigation effective on March 20, 2006 and he signed and dated definite Administrative Subpoenas, which were rejected at Newark Speaks; see Exhibit Q to Plaintiff's Cert. in Opp. signed by Director Ambrose.

The involved Captains, Lieutenants and Sergeants appeared at depositions to be much more defensive than their Superiors within the Command, knowing they had exceeded their positions of authority, in collecting all the private data of NPD Police Officers, but they were determined to identify 'those who posted on the Newark Speaks website' and to unabashedly punish them. No shallow facts of efficiency of the Officers were ever presented at depositions to support any defense argument. The critical testimony was placed before the Court to discern the purposeful illegal motivations.[14]

The chronology of IAD reporting from March 24, 2006 reveals Lieutenant Cuccolo assigned the investigation to Sergeant Sanders and Lieutenant Kowalski. There was an advance written

---

[14] Even more testimony can be shown for any Reply to opposition filed with the Court. For the filing of 9/22/10, we produced testimony from the case-at-bar; also the testimony for the U.S. District Court case of Louis Wohltman, Docket No. is available for time of trial. (It is voluminous in aggregate production for Montalvo and Wohltman.)

submission from Sergeant Sanders; and Cuccolo began viewing the postings, himself. Three days later, on March 27, 2006, Sergeant Sanders reports that he processed Administrative subpoenas to Newark Speaks to find out the IP addresses on Caballero De Newark, The Rock and IOP Deez Nuts and others.[15] Importantly, Sergeant Sanders admits, in writing, that he spoke with Andrea Almeida, who represented Newark Speaks, to obtain information on all three screen names. Noticeably, he did not specify any reason why he would request the identity or personal data concerning "The Rock" but stated the other two screen names talked about Detective Griffith. Then, on March 29, 2006, the owner, Moses Wilson spoke with the IAD, however, the next IAD report by Sergeant Sanders indicates the Administrative subpoenas were turned down by Newark Speaks. There was only a single discovery 'proof' exchanged for an Administrative subpoena signed by Director Ambrose on March 30, 2006, but the testimony suggests that at least **eleven** Grand Jury subpoenas surfaced with responses, but eleven Officers were not terminated nor investigated like Jose.

On April 3, 2006, Sergeant Sanders filed an incident report for Detective Griffith under CC #32709, Event #141153, on some vague notion that this Detective read on Newark Speaks an opinion someone wore a 'wire' for the Command. The Essex County Prosecutor's Office had no basis to believe any Police Officer's life was being threatened to issue any Grand Jury subpoenas for Newark Speaks, but that is what occurred for IP screen names: IOP Deez Nutz, Cabellero de Newark, The Rock, Wife of Appopo, Braveheart, Spanish Femme, Master Chief, Hitdabricks and numerous others. On May 23, 2006, there was another IAD submission by Sergeant Sanders to summarize information gleaned from the Grand Jury subpoena process, but no indication a Grand Jury ever became impaneled. The deposition testimony is more conclusive for the illegal subpoena process, as testified by the former Assistant Prosecutor, John Wojtal at Exhibit I at Plaintiff's

---

[15] The three Officers behind these screen names were not all subject to IAD investigations. The focus was The Rock and Spanish Femme, already believed to be the Montalvos.

Counsel's Cert. at 9/22/10. As he explained, he worked in the Criminal Courts but he was part of Professional Standards to make sure sworn law enforcement officers did not violate any rules or regulations, Wojtal at T.14:7-T.15:5 (prior <u>Exhibit F</u>). Here, Wojtal deliberately failed, and only uses the thin rationale…he goes way back in time working with [Director] Ambrose…

### E.    Nothing Was Based On A 2C Criminal Complaint, As Stated At The Assistant Prosecutor's Deposition.

The Assistant Prosecutor from Essex County testified that their Agency was not intended to get involved with the Newark City Police Department to handle any administrative violations by any member of their Department, Wojtal T.15:6-T.16:1. Meanwhile, the Montalvo subpoenas issued under the authority of their Professional Standards Unit within the Prosecutor's Office. They received [false] information from Lieutenant Kowalski and Sergeant Sanders to believe a crime had been committed, but see Wojtal T.18:22-T.24:3… *no report issued from the City of Newark Police Department to indicate any crime and there was no basis for illegal Grand Jury subpoenas nor for authorizing anyone to execute such subpoena under John Wojtal's name.* This Asst. Prosecutor denied giving anyone authority to sign or forge his name at the Professional Standards Unit. Again, two different Judges would not even support or sign a Communication Data Warrant; see Wojtal T.28:4-20: *"Sergeant Sanders and Lieutenant Kowalski worked as a team. Director Ambrose and Captain Ebler were aware of what we were doing"*; see T.36:5 to T.37:19; see Plaintiffs' Counsel's prior Certification at <u>Exhibit I</u>. *Kurt Ebler was involved and Wojtal explained the requirements of a Grand Jury subpoena and the Secrecy Rule pertaining to Grand Jury subpoenas.* Wojtal knew the limitations in providing any private information, as would impact these Plaintiffs. After denying his signature on the subpoena material, he explained that the data or information could not be used for administrative charges or internal punishments within the NPD, but those facts occurred and Plaintiffs were terminated, <u>after</u> <u>their</u> <u>civil</u> <u>rights</u> <u>were</u> <u>violated</u>!

30

**F.     Internal Affairs Supervisory Officers Became Pro Active To Procure Information And Identities Through The Assistant Essex County Prosecutor Using Grand Jury Subpoenas.**

Unquestionably, the First Amendment protects a public employee's right to speak as a citizen about matters of public concern under certain circumstances, <u>Sigsworth v. City of Aurora, ILL.</u> 487 F.3d 506, 508 (7th Cir. 2007), citing <u>Garcetti v. Caballos</u>, 547 U.S. 410, 416-417 (2006). There, it was decided a public employee can establish his or her speech is protected if:  (i) the employee speaks as a citizen on matters of public concern, and (ii) the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the State as an Employer, in promoting the efficiency of the public services it performs through its employees, Id. at 509, and, see, <u>Schad v. Jones</u>, 415 F.3d 671, 674 (7th Cir. 2005).  Clearly, <u>Garcetti</u> was never meant to be a categorical constraint rule to deprive public employees' speech under the First Amendment, and, more particularly, whenever employees complained of work-related misconduct of others, they were calculated for a further protection under the various State whistleblower statutes.  New Jersey has an expansive common law right of privacy and informational privacy, <u>State v. Reid</u>, 389 N.J. Super. 563 (App. Div. 2007); <u>State v. Carty</u>, 164 N.J. 351 (2002).

**G.     Restricting Speech Owes Its Existence To The Specific Public Employees Professional Responsibilities; It Does Not Apply.**

Here, Plaintiff(s), amongst other citizens, discussed [his] own political opinion of Supervisory misconduct at various levels within Newark Administration.  He indicated notions of "Supervisory Misconduct" and wrote about corruption methods.  It was not, and never was, a part of Jose's job duties or official duties to supervise or oversee any of the "Supervisors' (Mis)conduct," which was discussed.  <u>He was a mere Police Officer in the City of Newark hierarchy</u>.  Therefore,

Mr. Montalvo would not be restricted in his speech or written speech verbiage.[16]  He has a valid First Amendment claim and protections apply.  There is nothing for the defense advocate to argue in terms of the specific duties of Montalvo, as a public employee, nor is there any compromise of efficiency to weigh.  Corruption and misconduct, politics[17] should not be hidden from the public, but eradicated for the public good.  For a compulsory [Grand Jury] subpoena, there must be observance of the requirements.  No elements or evidence of a libel claim exists.  Here, no case for defamation liability is suggested; Doe v. Cahill (S. Court, Delaware) decided October 5, 2005.

### H.   Plaintiff Would Not Have Been Terminated Without Illegal Subpoenas. His Identity Would Never Have Been Revealed For Any IOP.

Testimony was taken from Lieutenant Kowalski to determine his exact role within the Internal Affairs Division and how the NPD Supervisory Officers manipulated the Essex County Prosecutor's Office to obtain Plaintiff's private information; again, see Exhibit S to Plaintiff's Aff. In Opp.  There were definitely a grouping of subpoenas produced in discovery, dated April 6, 2006, addressed to The Planet, Moses Wilson, Webmaster@newspeaks.com. et alia.[18]  Proof existed that each such Subpoena required billing information, methods and history of payment, internet protocol connection data, internet protocol addresses, methods of connection, all connection times and dates, subscriber name, address, contact telephones, social security numbers, remote dial-in service logs, automatic number identification number and Jose's entire account information.  The contrived Administrative Subpoenas (Exhibit Q) and Grand Jury Subpoenas (Exhibit S) to Plaintiff's Aff. in Opp. proves the purposeful invasion of privacy.  Lieutenant Kowalski became bold to acknowledge

---

[16] Further to the argument, Mr. and Mrs. Montalvo could not be compelled to testify against each other as a husband or wife.

[17] For expressing political opinions, this 3rd Circuit has protected employees, Novosel v. Nationwide Insurance Company, 721 F.2d 894, 896 (3rd. Cir. 1983).

[18] **Eleven subpoenas should exist with results but this was pre-selected discipline for termination of the Montalvos and only a few undesirables like Jose.**

exactly what they pursued without any remorse. Kowalski T.182:5-T.189:12 (Exhibit B to Plaintiffs' Counsel's Cert. at 9/22/10 filing).

Critical to this Court determination is the fact that the same Assistant Prosecutor Wojtal sent two (2) written communications to the Director on May 23, 2006, stating: "**There is no basis for any criminal prosecution for investigation**," Exhibit S to Plaintiff's Rule 56.1 9/22/10 filing. Obviously, the Essex County Prosecutor's Office abused its authority to satisfy the former Director of Police Ambrose's interest to invade the privacy rights of its own Police Officers, without any criminal prosecution goals!  Lately, Anthony Ambrose has a lofty position running the same Essex County Prosecutor's Office, where he flaunted the law and Grand Jury Rules or other surveillance controls for New Jersey citizenry.  It is still patently clear that Plaintiff's speech (or writing) over the internet is entitled to First Amendment protection.[19]  Importantly, this protection extends to anonymous internet speech, whether in blogs, chat rooms, or in other forums, for advocacy or dissent, on home computers.  Reno v. ACLU, 521 U.S. 844 (1997); Doe v. Zthemart.com Inc., 140 F. Supp. 2d 1088, 1097 (W.D. Washington 2001).  Political opinion is leniently granted.

There can be no possible allegation that Plaintiff(s) used the Employer's computers or communicated within the scope of their duties.  Rather, Jose was communicating on his own home computer in the privacy of the domicile.  Jose had no opportunity to file opposition to quash subpoenas.  The NPD was not aiming to prevent corruption or clean up Supervisory Misconduct. Instead, Supervisors set out to punish and retaliate against only a handful of Officers, Yessenia Montalvo, **Jose Montalvo**, Darius Smith and Louis Wohltman.   Other Officers received light suspensions (2 or 3 days) or were ignored or exonerated, not him.

---

[19] See Plaintiffs' prior Statement Rule 56.1, paragraphs Nos. 113 to 195, inclusive.  The New Jersey Supreme Court has now recognized these privacy rights.

This Court has jurisdiction over the Plaintiff's claim for violation of his Federal constitutional rights pursuant to 28 U.S.C. § 1331 (Federal question jurisdiction) and 28 U.S.C. §1343 (jurisdiction over Federal constitutional claims). Further, there is supplemental jurisdiction over the Plaintiff's State law claims, 28 U.S.C. §1367(a) because these arise out of the same set of facts as the Federal claims such that all claims form part of the same case or controversy. At all times alleged, Defendants Ambrose, Bradley, DeMaio, Kinder, Ebler, Gagliano and even Mejias were acting within the scope of their duties and employment under color of law as higher privileged Police Officers of the NPD to intentionally cause this remaining Plaintiff harm and wrongdoing. Defendant, Anthony Ambrose, III, the former Director of Police, participated in the NPD's unconstitutional actions by directing and approving, without a judicial warrant or filed lawsuit, opportunity to issue subpoenas against the New Jersey Court Rules 4:26-4, to get at the very indentify of an anonymous speaker over the internet. No criminal prosecution existed for the time of any illegal subpoena situation, and the past filed Statement of Undisputed Facts, Rule 56.1, on 9/22/10 depicts the greater illegal wrongdoing. There is no excuse here. The 'terrorist' Daniel Mejias had already confessed before Jose's rights were violated.

### POINT V

### CONSPIRACY TO COMMIT CRIMES, TORTS OR AID THE COMMISSIONS OF CRIMES OR TORTS

**A.      Count IV Of The Amended Complaint.[20]**

Certainly, employees are not guaranteed a perfect workplace, free of annoyances or colleagues or even superiors which they find disagreeable. Lynch v. New Deal Delivery Services, 974 F.Supp. 441, 452 (D.N.J. 1997). Rather, what is illegal is a discriminatory or retaliatory hostile work environment. Id. at Lynch.   As the NPD became increasingly culpable for wrongdoing

---

[20] Unfortunately, there are two Count IV's in the Amended Complaint as a mistake, but with different allegations. We are re-numbering for the Court to follow the argument.

against Jose Montalvo, the Supervisory workforce became increasingly aggressive to commit to a conspiracy of wrongdoing.   First, it was to carve out a permanent discipline record for Jose Montalvo, *but he only had minor administrative offenses*.   Through time, the Supervisors, as identified from 1992 to 2001, sought IOP's and CAP's, but they only achieved limited suspension of five (5) days.   Their acts smacked of retaliation, which ended in wrongful termination, N.J.S.A 5:10-12 (d).   The Chain of Command in effect, conspired to violate Jose Montalvo's rights of free speech under the First Amendment, rights against search and seizure; Fourth Amendment, as would pertain to the United States Constitution and also privacy rights were violated under the NJ Constitution, Article I.   Further, there were violations of the New Jersey Wiretapping and Electronic Surveillance Control Act, N.J.S.A. 2A:156A-1 et. seq. and the Grand Jury Secrecy Rules.   All told, the NPD, through two IAD Units, misused the State criminal process under the direction of the Director Ambrose, Captain Ebler, Lieutenant Cuccolo, Lieutenant Kowalski, Lieutenant Leroux, and also Detective Sanders, to address what was, at most, known to be an internal issue.   It cannot be refuted that there were not improper disclosures of the Grand Jury information, which was never impaneled, N.J.S.A. 2B:21-10, *just to terminate Jose*.   Here, these high placed Supervisors/Director/Captain entered into a definite conspiracy to actually commit crimes, and aid the commission of crimes.   The Secrecy Rule behind the Grand Jury subpoenas, R. 3:6-7, is plain-written.   The Prosecutor's Office knowingly capitulated to the Director of Police, Ambrose, and the IAD/Prof. Stds. force, and all of these highly trained individuals acted within the scope of their duty invading Jose's confidentiality and privacy to break the law and all Rules known.

The Plaintiff does not have to put forward 'smoking guns' to prove the aberrant discriminatory intent or retaliatory goals to wrongfully terminate.   The conspiracy is that evident in the very facts of testimony adduced and cited in this Movant's original Brief filing and for the

Opposition Brief.   The incidents described at Plaintiffs' past, and present Affidavits show a

profound impact upon the "reasonable man."   The alleged discriminatory and retaliatory harassment

occurred strictly by race/ethnic identity, with a mounting retaliatory animus for pretextural wrongful

termination.   The ongoing conduct of false statements, IOP's and CAP's, and assignment/re-

assignment with permanent status at the Cell Block (Exhibit J), disarming the Plaintiff and

compelling him to work without the same overtime benefits as counterparts, rose to the required

level of being severe and pervasive hostile work environment.   Further, it reveals a pattern and

practice of padding Jose's discipline record.   Specifically, at 2005, Jose receives excessive

punishment, 20 days loss of pay, to set up more excessive penalties, a wrongful termination.   This

could not have been accomplished without the illegal wrongdoing, as afore-described.

The Plaintiff has produced sufficient evidence by which the reasonable finder of fact could

believe that an invidious discriminatory reason was more likely than not a motivating and

determinative cause of the discrimination scheme for termination.   The weaknesses, inconsistencies

and contradictions in the employer's argument for legitimate reasons for its actions must meet the

test of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973); Fuentes v. Perskie,

32 F.3d 759, 763 at 765 (3rd Cr. 1994); Jones v. School District of Philadelphia, 198 F.3d 403, 413

(3rd Cir. 1999); or St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519, 113 S. Ct. 2742, 125 L.Ed. 2d

407 (1993).   The Defense proffered reason is mere pretext for discrimination and retaliation and

violates all statutory protections, Federal, State and the Grand Jury Rules, or Surveillance Act.

## POINT VI

### THE REAL ISSUES WITHIN THIS LAWSUIT FOCUS ON FAILURES TO PROPERLY TRAIN AND SUPERVISE OR TO OVERSEE POLICE DEPARTMENT ACTIVITIES AND PREVENT WRONGDOING: 1983 CLAIMS VALID.

### A.      This Should Be Count V Of The Amended Complaint.

As aforesaid, the employer avoids monitoring or overseeing the NPD. There is no effort made to determine officers' rights and remedies, proper investigations and non-violation of the Rules and Regulations or to uphold the law.   The very real issues underlying all Plaintiffs' allegations of their Amended Complaint are affirmatively stated in the NPD Rules and Regulations, "R/R," but never enforced, as intentional failings, to wit, **Neglect of Duty, Official Misconduct, Misuse of Official Position, Orders for Fraternizing, Desk Blotter Violations, Violation of The Legal Responsibility of Supervisory Officers, False Statements and Reports Within the Precincts and Internal Affairs Division, Rules of Returning Weapons to Disarmed Officers, or Policies Pertaining to Treatment of Police Officers, Standards For Hearings, [Invalid] Use Of The Essex County Prosecutor's Office to Obtain Private Information of the Plaintiffs, [Illegal] Searches/Seizures, Improper Entrapment, Civil Rights Violations, Constitutional Law Violations, Rules For Progressive Discipline, Police Trials** and **Wrongful Termination**.  These are all defined requirements of Police Officers/the Command itself.   Plaintiff has identified the deficiencies and indicated those deficiencies caused his alleged constitutional violation.   Those failures to remedy the deficiency reflected deliberate indifference on the part of the municipality. Malignaggi v. County of Gloucester, 855 F. Supp 74, 77 D.N.J. 1994, City of Canton v. Harris, 489 U.S. 378 (1989).  Montalvo was always competent and knowledgeable to have testified to the exact deficiencies by the Supervisory workforce, in each instance where he was mistreated for constitutional and other violations.   Defense Counsel purposely made no deposition inquiry to comprehend Jose's response or his knowledge.

### B.      General Orders, Director's Memorandum And Other Protocol.

For almost six years, Jose was a victim and he witnessed a conspiracy of official misconduct and misuse of authority, contrary to the Rules and Regulations.   Acts of deception, lies, false

reporting, misconduct and manipulation of the rules was applied to him so as to deprive them of his rights and remedies within the Employer's workplace. When he and his wife were subjected to Newark Speaks IAD interrogation, they were confronted with private facts strictly confidential to their person and marriage. Supervisory Officers flaunted their authority to depart from all legal methods. Different than other Police Officers, this Plaintiff was not coached to present "acceptable facts," but, rather, he was set-up to give incriminating evidence against his own spouse, and Yessenia was in the same 'boat' as him to be asked questions *outside the scope of "Terroristic Threats"* upon Jose. The timing of Jose's interrogation at the IAD was beyond the time of the confession of Daniel Mejias, who surfaced as the terrorist putting a bounty on Jose's head.

It may be argued, police personnel are not permitted to invoke or address their own concerns, but the Command had already "neglected their own duties" R/R 2:3-7;[21] pursued "official misconduct" R/R 2:3-11; and, lastly, "misuse of official position." In summary capsule, the recordkeeping from the City of Newark Police and Prosecutor's office proves a conspiracy of false statements in all reports R/R 18:22; manipulation of the rules, regulations, written policies and violations of the criminal laws and Grand Jury rules. In effect, the Chain of Command sabotaged the whole integrity of the City of Newark legal system at the Essex County Prosecutor's door by taking Grand Jury confidential files from its office via facsimile or by heavy-handed pressure tactics of serving Ambrose's Administrative Subpoenas (Exhibit Q) and Grand Jury Subpoenas (Exhibit S).

General Orders 05-04 and 80-1 exist to abide the law, and for the Employer's IAD to follow the written directives of the Attorney General of the State of New Jersey, not to break the law. All Supervisory Officers must insure that charges follow progressive discipline; trial board protocol; and had to be reasonable determinations. Instead, these Supervisors, including the highest Director of Police, Ambrose, Captain/Deputy Chief Ebler, Lieutenants Cuccolo, Kowalski and Leroux, and

---

[21] References The Rules and Regulations; see brackets.

Detective Sanders, corrupted the system and all R/R as would pertain to Jose. They were in the Supervisory Command acting under Orders and within the scope of their duty. They aided and abetted known wrongdoing in deliberate manner and there is no possible excuse.

To prevail in a § 1983 action, Plaintiff must establish: (1) the conduct constituted a State action or action committed while acting under color of State law; (2) the conduct deprived Plaintiffs of rights, privileges or immunities secured by the Constitution or U.S. Laws. Kneipp v. Tedder, 95 F.d. 199, 1204 (3rd Cir. 1996); Green v. City of Paterson, 971 F.Supp. 891, 900 (D.N.J. 1997). While § 1983 does not, by its own terms, create substantive rights, it shall provide remedies for deprivation of rights established elsewhere in the Constitution or Federal laws. Baker v. McCollan, 443 U.S. 137, 144n. 3, 1990 S.Ct. 2689, 2694 n. 3 61 L.Ed.2d 433 (1979); Kneipp v. Tedder, supra; Groman v. Township of Manalapan, 47 F.3d 628, 633 (3rd Cir. 1995) and its progeny. One can go into Court and hold the municipality liable for the injuries inflicted, as being permitted under adopted policies or customs. Monell v. Dept. of Social Services, 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, L.Ed.2d 611 (1978); Beck v. City of Pittsburgh, 89 F.3d 966. 971 (3rd Cir. 1996), 1117 S.Ct. 1086 (1997) or Anders v. City of Philadelphia, 895 F.2d. 1469, 1480 (3rd Cir. 1990). The policy makers of the City of Newark can reasonably be said to have been deliberately indifferent to the need to train/supervise and institute new policy to clean-up the corruption. They only pretend to use Directors Memorandum, General Orders or R/R and IAD G.O. 04-05. (Exhibit DD). This is not a weak argument for better or more training to avoid injury causing conduct but rather supervision and enforcement must occur or new protocol must be established or enforced to implement non-discriminatory, non-retaliatory action or neutral monitoring of NPD. The municipality had to map out a real program with stated objectives to prevent discriminatory/retaliatory targeting.

## POINT VII

## DEFAMATORY INJURY TO REPUTATION.

### A.    Count VI Of The Amended Complaint.

As a result of an ongoing conspiracy started in the NPD (with a sexual scandal in the COMSTAT room), these Plaintiffs did not receive a fair termination Hearing process.

There is no evidence to support any discipline charges against these Plaintiffs except for bad and mixed motives, in every instance.  Here, a liberty interest arose in the employment context where both Plaintiffs' good name, reputation, honor and integrity were at stake because of what the Employer's Agents were specifically stating and doing to each of them, over and over again, and see the progeny of Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971) or Robb v. City of Philadelphia, 733 F.2d 286, 294 (3d Cir. 1984).  Plaintiffs have been stigmatized in the constitutional sense, and the greatest proof is that Jose Montalvo has never obtained any job offer by reason of what is stated concerning his discipline, removing his duty and personal weapons, and final removal as an unfit Officer in the NPD.  Meanwhile, Yessenia only received a temporary job offer from a former employer and, then, a part-time job offer through a friendly colleague, who deliberately ignored what was being said about her work history, IAD investigations, discipline and termination.  Moreover, Yessenia was persuaded to return to the NPD due to being in dire financial straits and needing to become a full time wage earner, again.  Defendants cannot avoid the argument of wasting Plaintiffs' "liberty interests," and permitting them to be intentionally stigmatized for years.  Neither Plaintiff's personnel or discipline records were significant, or the real reason they were terminated from their employment with the NPD; and, the "stigmatized" adverse employment action still continues today, as set forth in Plaintiffs' prior Statement and Affidavits made part of the original application and this opposition.

# POINT VIII

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

### A.      The Last Two Counts Support A Single Cause Of Action.

This Plaintiff asserts claims for intentional infliction of emotion distress arising out of the foregoing events, starting at the false accusation, sex on the COMSTAT table, and through the time of false IOP's, CAP's stigmatizing his reputation.  Further, there was a per quod claim for the co-Plaintiff, as Jose was in the zone of danger within the NPD for the outrageous physical assaults (2), on Yessenia, with her ultimately losing one triplet at or before birth.  Also, there was the burglarizing of their home; spray painting of their vehicle (3 occasions).  Jose was caused to experience the aftermath of his wife's sexual harassment by Supervisory Officers, with physical touching of breasts, body contact and/or solicitation of sex at work.  An Officer's penis was placed on Yessenia's shoulder.  Certainly, these acts rise to the level of outrageousness necessary to provide a basis for recovery, <u>Harris v. Middlesex County College</u>, 353 N.J. Super. 31, 46 (App. Div. 2002).

When coupled with the constant retaliatory activity of Jose being assigned, then re-assigned permanently to the Cell Block, unarmed, for almost six years and then facing false Departmental charges for a 2000 shooting at 2005/2006, 20 days suspension for him, he is legitimately diagnosed for post traumatic stress (PTSD).  See report of Jesse Whitehead, Psy.D. (<u>Exhibit QQ</u>).  This is not a situation of just improper IAD investigations, but no investigations are occurring despite NPD mandatory protocol, G.O. 05-04.  This Plaintiff was an open and repeated victim of intentional and outrageous misconduct by the Defendants, through its agents for proximate cause and distress that is severe.  <u>Griffin v. Topps Appliance City, Inc.</u>, 337 N.J. Super. 15, 22 (App. Div. 2001), <u>Zamboni v. Stamler</u>, 847 F.2d 73, 80 (3d Cir. 1988).  Jose's situation has been compounded over time with

financial losses since he has not worked in gainful employment. He has been confronted by stigma plus defamatory damages for every possible job to which he applies; see Affidavit of Montalvo, 9/22/10 filing with the greatest details. The Retaliation Complaint indicates Jose did not obtain COBRA notification for health insurance. His assets dwindled and all he has is loans and he faces bankruptcy as a situation of hardship after the pretextural/retaliatory termination program. In view of the foregoing, Plaintiff's punitive damages issues remain viable for Court determination. This exceeds all the bounds of decency and there is an expert analysis from Dr. Whitehead, Jr., (Exhibit QQ), but also the Forensic Economist's analysis (Exhibit PP) sheds even more light.

## CONCLUSION

In the interest of justice, Defendants' Motion for Summary Judgment pertaining to the Amended Complaint should be denied. Plaintiffs had originally filed their Complaint to the Superior Court in Essex County after a proper Notice of Claim requirement was served to three separate sources, for investigation. Nothing was ever done for either Montalvo. Their original lawsuit, filed on January 11, 2006, was not even recognized as protected activity. Without any guidance of the City Administration, the NPD Commanders, all temporary City Acting Directors, Ambrose, Campos and Bradley, moved forward, and violated the Grand Jury Secrecy Rules and all known statutory Surveillance Control Laws, State and Federal, to invade the privacy/confidentiality of Jose Montalvo for at home, computer and other comprehensive identifying criteria of his person; and, only to terminate his employment and to ruin him, forever.

Dated: October 29, 2010

                                     Respectfully Submitted,
                                     Law Offices of
                                     WENDIE L. ELOVICH, P.A.
                                     Attorney for Plaintiffs

                            By: /s/ Wendie L. Elovich
                                WENDIE L. ELOVICH, ESQ.